Billy WOODARD *v.* STATE of Arkansas

CR 76-50                                   553 S.W. 2d 259

Opinion delivered June 27, 1977
(In Banc)

*M. Burk Dabney, Jr.,* for appellant.

*Bill Clinton,* Atty. Gen., by: *Robert A. Newcomb,* Asst. Atty. Gen., for appellee.

ELSIJANE T. ROY, Justice. Appellant Billy Woodard was charged with capital felony murder in violation of Ark. Stat. Ann. § 41-4702 (Supp. 1973). The information charged that appellant on September 3, 1975, while robbing C. M. Baker shot the victim, causing his death. The jury returned a verdict of guilty as charged and after further deliberation determined appellant should be sentenced to death. The court entered judgment accordingly. This appeal is from that judgment and sentence.

The record reflects Baker was a resident of Craighead County, Arkansas. The last day he was seen alive was September 3, 1975. Some hunters discovered his body in the floodway area near Payneway on September 7, and notified the Poinsett County sheriff's office. An investigation revealed

appellant had been at the Baker home on the last day that Baker had been seen there by his wife.

After the body was found appellant was brought to the Craighead County sheriff's office for questioning on September 7, 1975; a statement was taken from him at that time and he signed a consent for the officers to search his mobile home. A search was conducted and appellant gave the officers a 12 gauge shotgun they found there. He was then released.

More than a month later the crime had not been solved, and on October 10, 1975, appellant again was picked up by the Craighead County sheriff's department and taken to the sheriff's office in Jonesboro, where he was fingerprinted and photographed. Craighead County Deputy Sheriff Findley and State Police Investigator Odom drove appellant to the scene where the body was found, and, after being questioned and shown photographs of the deceased, appellant gave a statement to the police officers admitting he had shot and killed the deceased and had taken his billfold which contained about $160. Officers Odom and Findley, after placing appellant under arrest and charging him with capital felony murder, delivered him to the Poinsett County jail.

On the same day appellant gave another statement to the Poinsett County sheriff's office which was essentially the same statement as that given to the State Police. On October 11, appellant also made a tape recorded statement which was almost identical to the first two statements. All these statements were admitted over objections at the trial. Appellant took the stand and repudiated all three statements and denied having killed or robbed the deceased.

For reversal appellant first contends the court erred in admitting appellant's confession taken by officers Odom and Findley on October 10, 1975.

Appellant testified that Findley had contacted him following discovery of Baker's body and had taken him to the sheriff's office for questioning around 10:30 a.m. on September 7. He stated he did not fully understand at that

time that he either had a right to give a statement or not give a statement as he desired; that, although the sheriff's department knew he was a diabetic he was refused an insulin shot; and that he arrived at the sheriff's office about 10:30 a.m. and that he did not have anything to eat or have an insulin shot from that time until a little after 4 p.m. (It is noted appellant made no self-incriminating statement at this time.)

Appellant also testified that on the 10th day of October he was arrested at 7 a.m. and was detained in the Craighead County Sheriff's office until shortly before noon; that he was photographed and fingerprinted; that he was taken to the place where the victim's body was discovered and was shown a number of photographs of the victim; that he was also told he might have to stay at the scene all night; and that he was physically abused before he gave the statement.

The trial court, pursuant to Ark. Stat. Ann. § 43-2105 (Supp. 1975), held the required *Denno* hearing to consider the circumstances surrounding the giving of appellant's confessions. *Jackson* v. *Denno*, 378 U.S. 368, 84 S. Ct. 1774, 12 L. Ed. 2d 908 (1964). Under this statute it is the duty of the court " . . . before admitting said confession into evidence to determine by a preponderance of the evidence that the same has been made voluntarily." Appellee contends the record clearly supports the court's finding that all these confessions were voluntary.

This Court, in *Neal* v. *State,* 259 Ark. 27, 531 S.W. 2d 17 (1975), rehearing denied January 26, 1976, has stated that:

* * * Whenever the voluntariness of a defendant's confession is disputed on federal constitutional grounds, we make an independent determination from a review of the entire record. *Degler* v. *State,* 257 Ark. 388, 517 S.W. 2d 515 (1974); *Davis* v. *North Carolina,* 384 U.S. 737, 86 S. Ct. 1761; 16 L. Ed. 2d 895 (1966); and *Harris* v. *State,* 244 Ark. 314, 425 S.W. 2d 293 (1968). In doing so, however, we do not set aside a trial court's finding of voluntariness unless the finding is "clearly erroneous." *Degler* v. *State, supra.* This standard of review is in accord with that of the federal courts. *United States* v. *United*

*States Gypsum Co.,* 333 U.S. 364 (1948), and *Maple Island Farm* v. *Bitterling,* 209 F. 2d 867 (8th Cir. 1954).

At the *Denno* hearing Officer Odom, the State Police investigator who actually took appellant's confession on October 10, 1975, testified that by the use of a rights form he advised appellant of all his rights. Odom also testified that appellant then signed the waiver of rights form. Appellant had received an insulin shot about ten o'clock that morning. After fingerprinting appellant, Odom took him and Findley to a restaurant for lunch. After lunch appellant, Findley and Odom left Jonesboro and traveled to the scene of the crime. Appellant had stated he did not object. On arriving at the crime scene appellant was again advised of his rights. After more questioning from the officers Woodard made his first statement. Odom denied he told appellant they were going to question him until he confessed and that to his knowledge no one coerced appellant, promised him anything, intimidated him or beat him to obtain the confession.

Appellant's confession was very detailed, consisting of ten handwritten pages.[1] It was written by Officer Odom, but each page was signed by appellant and the statement concluded as follows: "All of this statement is true and correct to the best of my knowledge. I make this statement without threats or promises being made to me." In the margin of the last page and followed by appellant's initials is the following statement: "Before making this statement I had been informed of my constitutional rights and understood them." Odom testified further that he then read the entire statement to appellant and appellant signed each page after some corrections were made. Appellant also read the confession and made some changes in it himself according to Odom.

Deputy Findley testified that on October 10 he stopped

[1]At trial appellant testified the entire statement was made up by the officers and he signed it because he was afraid. It is not surprising that the jury did not attach any credibility to this testimony since appellant in all three statements gave a myriad of details which would have been unknown to anyone else, such as being invited to eat watermelon with the deceased, what was done with the body and items in the possession of the deceased, etc. Testimony from other witnesses proved the accuracy of appellant's statements.

appellant's truck and asked him if he would come to the sheriff's office, and appellant complied with the request. According to Findley, Odom read appellant his constitutional rights and appellant indicated he understood them. Findley further testified there were no threats, coercion or promises of lenient treatment made to appellant. In addition, Findley denied he or Odom told appellant it would be best for him to make a statement. According to Findley when he, Odom and appellant arrived at the crime scene Odom again advised appellant of his constitutional rights. Contrary to the claims of appellant, Findley denied he physically mistreated appellant. In response to questions by the trial court, Findley denied he or Odom told appellant "if he would sign a confession that he had the easiest out in the world and that [they] would see that he got medical help."

The trial court found appellant was informed of his constitutional rights, that he knowingly and intelligently waived his right against self-incrimination and that the statement was made voluntarily. We find that the trial court's determination of voluntariness was *not* "clearly erroneous." *Neal, supra,* and *Degler, supra.*

Appellant next urges that the statement given to Sheriff Crawford and Deputy Sheriff Walker later on October 10 and the taped statement given the next day were illegally admitted as evidence. Appellant contends the earlier October 10th statement was involuntary and that consequently the subsequent confessions were also tainted by the same influences and therefore inadmissible.

In *Payne* v. *State,* 231 Ark. 727, 332 S.W. 2d 233 (1960), as to the admissibility of confessions we adhered to the rule announced in *Love* v. *State,* 22 Ark. 336 (1860), that when the original confession has been made under illegal influence, such influence will be presumed to continue and color all subsequent confessions, unless the contrary is clearly shown.

However, appellant's reliance upon *Payne* and other similar citations is misplaced because, as heretofore pointed out, we do not find the first confession was procured by illegal means. Even if we assume the statement given Officers Odom

and Findley was involuntary, it does not automatically follow that the subsequent confessions are as a matter of law involuntary.

In *Matthews v. State,* 261 Ark. 532, 549 S.W. 2d 492 (1977), this Court held:

> * * * Whether a confession subsequent to one obtained by unlawful pressure is voluntary depends upon whether an inference as to the continuing effect of the coercive practices may fairly be drawn from the surrounding circumstances and is determined by a conclusion as to whether the accused, at the time of the second confession, was in possession of mental freedom to confess or deny his suspected participation in a crime. The effect of earlier abuse may be so clear as to forbid any inference other than that the later confession is involuntary. *On the other hand, one making a confession which is involuntary is not perpetually disabled from making a voluntary confession after the conditions of abuse have been removed. Lapse of time is an important consideration.* (Italics supplied.)

In the present case the incriminating statements given by appellant to Sheriff Crawford and Deputy Sheriff Walker were made while he was in possession of the mental freedom to confess or deny his participation in the crime. There had been a lapse of time and change of circumstances since the earlier statement had been given.

After Officers Odom and Findley had taken the confession of appellant at the crime scene they took him to Harrisburg (Poinsett County) and released him into the custody of Sheriff Gerald Crawford of Poinsett County.

Crawford testified at the *Denno* hearing that after appellant was delivered to the sheriff's office all of his rights were read to him by either Crawford or his deputy, James Walker. He further testified he did not know appellant had given the previous statement to Craighead County officials when his confession was taken by Poinsett County officers.

Sheriff Crawford testified appellant told him Officers

Odom and Findley "were kind of mean to him" and that he (appellant) had rather be locked up in Sheriff Crawford's jail than in Craighead County; that appellant did not tell him specifically what Odom and Findley allegedly had done but that he saw no bruises on appellant's face or body.

Deputy Walker stated appellant did not raise any questions about not understanding his rights at the time the statement was given; that he appeared to understand his rights; that he had all of his faculties and appeared to be intelligent; that he answered the questions clearly and concisely; and that he freely and voluntarily made the statement. This second statement was almost identical with the earlier statement except it contained even more details.

The testimony of appellant himself at the *Denno* hearing constituted strong evidence that the confession appellant made to the Poinsett County officers was not made while he was under duress and was not tainted by any previous coercive influences. He testified he was not afraid of Deputy Walker, that he trusted him and that he was not threatened or mistreated by him. He also testified Sheriff Crawford treated him kindly and he was not afraid of Crawford but wanted to get away from the Craighead County officers.

The following morning, October 11, 1975, appellant gave Deputy Walker another statement, which was recorded. Before the statement was given appellant was again advised of his rights. According to Walker, appellant had no objection to making the statement, appeared rested and comfortable and was not threatened, abused or mistreated in any way. At trial appellant objected because the taped statement had not been in Walker's custody, but Walker testified he had heard the play-back of the tape and that it had not been edited, tampered with or altered in any manner from the time it was made to him until the time of the introduction of the tape in evidence.

For the foregoing reasons we find the trial court did not err in admitting all three of the statements challenged by appellant.

Since the rule excluding witnesses from the courtroom was in effect[2] during the trial, appellant urges the trial court erred in permitting a witness who had been in the courtroom during the proceedings to testify as a rebuttal witness.

At trial appellant took the stand and repudiated all three statements. Also on cross-examination when asked what he told the newspaperman who was taking pictures at the floodway area in Poinsett County appellant stated, "I didn't tell him nothing."

The trial judge, in holding Larry Fugate, the reporter, could testify in rebuttal, stated:

> It will be the ruling of the Court that the State will be permitted to call the witnesses Larry Fugate and Paul Holmes[3] in rebuttal testimony, the State not having used these witnesses in its case in chief, having presented not one but three separate and independent confessions purportedly made by the defendant. The defendant having taken the stand and testified in his own behalf. I believe the State could not know or anticipate in advance or during its case in chief, the defense did call both of these witnesses in their pre-trial motion in this case and was aware of these witnesses having reported this case extensively at the time of its occurrence. So the defense could hardly be surprised by any knowledge that these witnesses might have. And they being called for the purpose of rebuttal, the necessity of that rebuttal having developed during the cross-examination of the defendant, the objection will be overruled.

We find the trial judge did not abuse his discretion in allowing Fugate to testify. In *Williams* v. *State,* 258 Ark. 207, 523 S.W. 2d 377 (1975), this Court stated:

> The rule consistently applied by this court is that a violation by a witness of the rule of sequestration of witnesses, through no fault of, or complicity with, the

[2]Ark. Stat. Ann. § 43-2021 (Repl. 1964).

[3]Holmes was not called to testify.

party calling him, should go to the credibility, rather than the competency of the witness. *Harris* v. *State,* 171 Ark. 658, 285 S.W. 367; *Hellems* v. *State,* 22 Ark. 207; *Golden* v. *State,* 19 Ark. 590; *Pleasant* v. *State,* 15 Ark. 624. The power to exclude the testimony of a witness who has violated the rule should be rarely exercised. We have been unable to find any case in which this court has sustained the action of a trial court excluding the testimony of such a witness. While the witness is subject to punishment for contempt and the adverse party is free, in argument to the jury, to raise an issue as to his credibility by reason of his conduct, the party, who is innocent of the rule's violation, should not ordinarily be deprived of his testimony. *Harris* v. *State, supra; Aden* v. *State,* 237 Ark. 789, 376 S.W. 2d 277; *Mobley* v. *State,* 251 Ark. 448, 473 S.W. 2d 176.

This Court in *Norris* v. *State,* 259 Ark. 755, 536 S.W. 2d 298 (1976), reaffirmed the principle enunciated in *Williams, supra.*

Fugate testified appellant told "Sheriff Crawford, in my presence, that he threw a billfold, a pair of shoes, and three expended shotgun shells into the water." His testimony continued:

> \* \* \* He said that after he threw the shotgun shells and the shoes and the billfold into the water, he went up on a little hill or clump up north of the cut and slightly west of it and sat there for a while saying something to the effect of what have I done.

Appellant next argues that the trial court erred in including as an aggravating circumstance the question as to whether the capital murder was committed for pecuniary gain after the jury had returned a verdict of guilty to capital felony murder committed in perpetration of robbery.

We find it is within legislative prerogative to determine the factors to be considered by a jury when it decides whether the crime justifies the imposition of death as a sentence or life imprisonment without parole. Guidelines are necessary to

enactment of a valid statute. In *Gregg v. Georgia,* 428 U.S. 153, 96 S. Ct. 2909, 49 L. Ed. 2d 859 (1976), in his plurality opinion Justice Stewart stated:

> We have long recognized that "[f]or the determination of sentences, justice generally requires . . . that there be taken into account the circumstances of the offense together with the character and propensities of the offender." *Pennsylvania v. Ashe,* 302 U.S. 51, 55, 82 L. Ed. 2d 43, 58 S. Ct. 59 (1937). * * *
>
> * * *
>
> . . . [T]he concerns expressed in *Furman*[4] that the penalty of death not be imposed in an arbitrary or capricious manner can be met by a carefully drafted statute that insures that the sentencing authority is given adequate information and guidance.

Certainly whether the crime was committed for pecuniary gain is a pertinent and proper factor for the jury's consideration in determining whether the death sentence should be imposed.

The last point urged by appellant is that the court erred in failing to instruct the jury that it was not necessary to find mitigating circumstances in order to return a verdict of life imprisonment without parole.

Appellant's position is based on the following episode in the trial. The jury, having found appellant guilty as charged, retired again to determine the imposition of punishment issue and subsequently returned to the courtroom.

JUROR KNIGHT: We have a question.

THE COURT: What is your question, Mr. Foreman?

JUROR KNIGHT: We have answered Form A and B and we have come down to section II-C.[5]

---

[4]*Furman v. Georgia,* 408 U.S. 238, 92 S. Ct. 2726, 33 L. Ed. 2d 346 (1972).

[5]As an appendix we attach hereto a copy of Form C as returned by the jury.

THE COURT: Form C, number one?

JUROR KNIGHT: We are down to section II.

THE COURT: And what is your question?

JUROR KNIGHT: Your Honor, the way we have answered Forms A and B, section one, we have come down to section two where according to the law we have only one place to mark, and we can't agree upon that now.

THE COURT: Without stating — how are you divided numerically? I take it you have answered all of the questions on Form A and B and all questions on Form C, part one, which is A, B, C, and D?

JUROR KNIGHT: Right.

Continuing the discussion concerning Form C:

THE COURT: Are you down to part two, A and B?

JUROR KNIGHT: Right.

THE COURT: And you cannot agree as between A and B?

JUROR KNIGHT: Yes, sir.

THE COURT: How are you numerically divided on that question?

JUROR KNIGHT: Seven and five.

THE COURT: Ladies and Gentlemen, it is now only twenty minutes until four. You have not been deliberating over a very long period of time. Without further instructions, I am going to require you to retire and deliberate and see if you cannot reconcile your differences by further deliberations and discussion

among yourselves permitting everyone to be heard, to express their views and their opinions. Those opinions should prevail which appear most reasonable, logical, and sound.

You may now retire and deliberate, and if you are unable after a reasonable period of time, notify the bailiff.

Thereafter within a short period of time the jury returned with the unanimous verdict imposing the death sentence.

Appellant contends that the exchange between the judge and jury indicates "that the jury had the honest, though erroneous belief that since they had found aggravating circumstances existed, but found no mitigating circumstances, they had no choice but to render a verdict of death by electrocution." It is impossible now to ascertain the thinking of the jury, but we do not find the facts support this assumption made by appellant.

In order to determine if this point has merit we must review the events which transpired in light of the pertinent provisions of our statutes, Ark. Stat. Ann. §§ 41-4701 et seq. (Supp. 1973).

§ 41-4710. Trial procedure-Verdict in writing. A person charged with a capital felony shall be given a jury trial and sentenced pursuant to the following procedure:

(a) After presentation of all evidence and witnesses to be offered by the State and/or the defendant as to the guilt or innocence of the defendant, instructions to the jury, and argument by counsel, the jury shall retire and consider the case.

(b) If the jury finds the defendant guilty of a capital felony, the same jury shall sit again to determine whether the defendant shall be sentenced to death or life imprisonment without parole.

(c) In the proceeding to determine sentence, evidence may be presented as to any matters relevant to sentence

and shall include matters relating to any of the aggravating or mitigating circumstances enumerated in Sections 11 [§ 41-4711] and 12 [§ 41-4712] of this act. The State and the defendant or his counsel shall be permitted to present argument for or against the sentence of death.

(d) After hearing all the evidence as to sentence, the jury shall again retire and render a sentence based upon the following:

(i) whether beyond a reasonable doubt sufficient aggravating circumstances, as enumerated in Section 11 [§ 41-4711] of this act, exist to justify a sentence of death;

(ii) whether sufficient mitigating circumstances as enumerated in Section 12 [§ 41-4712] of this act exist to justify a sentence of life imprisonment without parole.

(e) The jury in rendering its verdict shall set forth in writing its findings as to each of the aggravating or mitigating circumstances enumerated in Sections 11 [§ 41-4711] and 12 [§ 41-4712] hereof and shall set forth in writing its conclusion:

(i) that sufficient aggravating circumstances (do or do not) exist beyond a reasonable doubt to justify a sentence of death;

(ii) that there are (or are not) sufficient mitigating circumstances to outweigh the aggravating circumstances.

(f) If the jury does not make the findings requiring the death sentence by unanimous verdict, the court shall impose sentence of life imprisonment without parole [Acts 1973, No. 438, § 10, p. _____].

Section 41-4711 denominates the aggravating circumstances, and § 41-4712 the mitigating circumstances to be considered by the jury.

The court in accordance with our statutes instructed the jury as follows:

\* \* \*

The aggravating circumstances set forth on Form A, which will be given to you, are the only circumstances that you may consider as aggravating circumstances. If you find that one or more of these aggravating circumstances existed beyond a reasonable doubt at the time of the commission of capital felony murder, you shall indicate your findings by checking the appropriate circumstance or circumstances on Form A, entitled Aggravating Circumstances, which shall be furnished to you before retiring.

A mitigating circumstance is one which does not justify or excuse the offense in question but may be considered as reducing the degree of the defendant's punishment. The circumstances set forth on Form B, entitled Mitigating Circumstances, which will be given to you before you retire, are not the only circumstances which you may consider as mitigating circumstances. If you find that one or more of these mitigating circumstances existed at the time of the commission of capital felony murder, you shall likewise indicate your findings by checking the appropriate circumstance or circumstances on Form B, entitled Mitigating Circumstances.

If you find that any other mitigating circumstance or circumstances existed which are not set out in Form B, you shall indicate this finding in the appropriate space on Form B and write in such circumstance or circumstances on the back side of that form.

After making the determination required to complete Forms A and B, you shall then set forth in writing your conclusions on Form C, entitled Conclusions and Verdict, which will also be provided to you before you retire.

You may not return a verdict imposing the sentence of

death unless you make written findings and conclusions first that beyond a reasonable doubt one or more of the aggravating circumstances indicated on Form A existed at the time of the commission of capital felony murder; second, that beyond a reasonable doubt no mitigating circumstance or circumstances which you may find to exist outweighs or equals in weight the aggravated circumstance or circumstances. And third, you must find that the aggravating circumstance or circumstances found to have existed are sufficient to justify beyond a reasonable doubt a sentence of death. Finally, the findings, conclusions and verdict form must be signed by each member of the jury. A copy of these instructions will be provided for you. You will be permitted to take them to the jury room with you for your deliberations for use during your deliberations.

When the jury returned to the courtroom the foreman advised the court that the jury had already completed Part 1 of Form C. The conclusions reached under Part 1 were that:

(a) (√) One or more aggravating circumstances existed, beyond a reasonable doubt, at the time of the commission of the capital felony murder.

(b) (√) One or more mitigating circumstances does not exist.

(c) (√) The mitigating circumstances are not sufficient to outweigh the aggravating circumstances.

(d) (√) The aggravating circumstances are sufficient to justify beyond a reasonable doubt, the imposition of sentence of death.

By answering the questions under Part 1 of Form C, as the jury did, the members had already decided the aggravating circumstances warranted beyond a reasonable doubt the imposition of the death sentence. As indicated by the foregoing steps, the jury complied with the required statutory procedure before finding the death penalty should be imposed.

We also find the judge had fully complied with the requirements of the statute in initially instructing the jury, and since the jury had answered all questions on Forms A and B and Part 1 of Form C no additional instructions were necessary for the jury to arrive at its decision as to imposition of sentence.

Pursuant to Ark. Stat. Ann. § 43-2725 (Supp. 1975), we have reviewed the entire record for possible error not raised by appellant and find no reversible error.

At the circuit court level appellant challenged the constitutionality of §§ 41-4701, et seq. but did not question their validity on appeal. This Court in *Collins* v. *State,* 261 Ark. 195, 548 S.W. 2d 106 (1977), upheld the constitutionality of §§ 41-4701, et seq.; therefore, any question as to the constitutionality of the statute has been resolved against appellant.

We find the facts of this case support the sentence of death by electrocution. At appellant's trial the jury found that the capital felony murder was, beyond a reasonable doubt, committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody and that the capital felony murder was, beyond a reasonable doubt, committed for pecuniary gain. The jury further found that one or more of the mitigating circumstances did not exist.

According to appellant's confession[6] he went to the victim's house on September 3, 1975, to work on the victim's Chevrolet pickup truck. After appellant fixed the truck the victim asked him if he knew where a house trailer might be for sale. Appellant replied in the affirmative and, riding in appellant's automobile, they started to look for it. During the ride appellant saw that Baker had a roll of bills and at that time decided he would rob him. After appellant's car ran out of gas Baker got out of the car and started walking away to rest under a shade tree while appellant put in some gas from a container he had in the car. According to appellant, as the victim walked away from him he "reached in the car and got

---

[6]All three statements are in accord on all the essential elements of the crime. The last two confessions contained a few more details than the first.

my Revelation 12 gauge pump shotgun, I got 3 shotgun shells out of the door pocket of my car and loaded the gun. I figured he had at least a couple hundred dollars judging from the money I'd seen in his billfold earlier over near Harrisburg. I walked up to the front of my car, Mr. Baker was walking away from me, I put the shotgun to my right shoulder and shot him one time in the left back. He was about 22 yards away from me, he fell to his stomach, then he got up on his hands and knees, he was moaning, he started crawling away from me. Then I walked or ran up close to him, he was still on his hands and knees, still crawling, still moaning. I pumped the empty shell out of the gun and shot him in the back again, he fell on his stomach. He kept on making them moaning sounds, I pumped the shotgun and shot him again in the side of the head. He quit moaning then, he'd rolled over on his back before I shot him the 3rd time. I layed my gun down in the road, then I got him by the feet and was turning him around, his shoes come off as I was doing this, I dragged him by his feet down the road a little ways and then I drug him out in the woods. I left the body in the woods, about 6 foot from the side of the road."

The report of the State Medical Examiner verified appellant's confessions as to the nature of the gunshot wounds and the pictures introduced as exhibits depicted the extent of the impact of the bullets particularly the last shot which was fired at a distance of approximately one foot from the victim's head.

Appellant was 22 years of age at the time he committed the murder, and his confession shows that no other person was involved in the crime. There was no testimony from a psychiatrist or psychologist that appellant was suffering from any mental disease or defect at the time of the murder.

We find no error in imposition of the death penalty under the facts of this case.

The judgment is affirmed.

GEORGE ROSE SMITH, HOLT and HICKMAN, JJ., concur in the result but adhere to the views expressed in *Collins v. State,*

261 Ark. 195, 548 S.W. 2d 106 (1977).

**A P P E N D I X**

**F O R M  "C"**

**CONCLUSIONS AND VERDICT**

The Jury, having reached its final conslusions, will so indicate by having its Foreman place a check mark (✓) in the appropriate space in the sentence in accordance with the Jury's findings. Your conslusions must be unanimous. Each member of the Jury will then sign at the bottom of this form.

**I.**

**WE THE JURY CONCLUDE:**

(a)  (✓)  One or more aggravating circumstances existed, beyond a reasonable doubt, at the time of the commission of the capital felony murder.

( )  One or more aggravating circumstances did not exist at the time of the commission of the capital felony murder.

(If answer here is that aggravating circumstances "did not exist," ship (b), (c) and (d) and check II A below.)

(b)  ( )  One or more mitigating circumstances does exist.

(✓)  One or more mitigating circumstances does not exist.

(c)  ( )  The mitigating circumstances are sufficient to outweigh the aggravating circumstances.

(✓)  The mitigating circumstances are not sufficient to outweigh the aggravating circumstances.

(d)  ( )  The aggravating circumstances are not sufficient to justify the imposition of the sentence of death.

(✓)  The aggravating circumstances are sufficient to justify, beyond a reasonable doubt, the imposition of the sentence of death.

**II.**

**WE THE JURY,** after careful deliberation, have determined that the defendant shall be sentenced to:

A.  ( )  LIFE IMPRISONMENT WITHOUT PAROLE.

B.  (✓)  DEATH BY ELECTROCUTION.

(In order to have checked "B" above, you must have answered number I (a) above in the affirmative, number I (c) above in the negative, and number I (d) above in the affirmative.)