James R. SHELTON *v.* STATE of Arkansas

CR 85-77 699 S.W.2d 728

Supreme Court of Arkansas
Opinion delivered November 12, 1985

324

*Hubbard, Patton, Peek, Haltom & Roberts*, by: *Michael D. Peek*, for appellant.

*Steve Clark*, Att'y Gen., by: *Joel O. Huggins*, Asst. Att'y Gen., for appellee.

STEELE HAYS, Justice. Just after midnight on April 1, 1984 the body of Deputy Sheriff Charles Barnes was found beside his patrol car on Holly Springs Road in Miller County, Arkansas. The headlights and spotlight were on and the motor was running. Officer Barnes had been shot through the back of the head.

Appellant James Shelton was convicted of the capital murder of Officer Barnes and sentenced to life without parole. On appeal, several instances of reversible error are alleged, two of which have merit.

James Shelton, age 17, and Gene Emfinger, Jr., age 14, worked together at Joe Singletary's dairy farm, where they lived in a bunkhouse. On the evening of March 31, 1984 Emfinger's cousin, Roger Dale Porier, picked the boys up to ride around in Porier's car. Porier was thirty-two years old and had a long criminal record. He had recently been released from a Texas prison. Shelton had known him only a few days.

During the evening, the three burglarized the Macedonia Baptist Church, Porier carrying a .30-.30 rifle. They took some articles of little value—paper towels, pencils and crayons and left. Porier then said he was going to ambush a passing motorist and stopped on the side of the road. Shelton and Emfinger stayed in the car as Porier hid with the rifle. Deputy Charles Barnes, patrolling in the area, stopped to investigate and as he spoke with the boys, Porier came up without the rifle, evidently to size up the situation. On a pretext of needing to relieve himself, Porier retrieved the rifle, held it on Officer Barnes and ordered him to lie face down in the ditch. Porier then shot him through the back of the head. A few hours later Roger Porier was killed in a shootout

with police officers. He had Deputy Barnes' pistol.

## I

We first address the argument that the trial court erred in denying a defense motion to suppress two statements made by Shelton to police officers. After the murder, Porier took Shelton and Emfinger back to the bunkhouse. They say he told them he would kill them if they told anyone what they had seen and that he parked outside the bunkhouse for an hour or so before leaving.

At about 2:30 a.m. Officers Phillips, Casteel and Liles came to the bunkhouse looking for Porier and another suspect named Hendrix. It took the officers ten or fifteen minutes and the use of a P.A. system to get James Shelton to open the door to the bunkhouse. The boys later explained that they were frightened and had hidden in a closet. The officers told them a deputy had been killed and asked if they knew Hendrix and Porier. They said they had not seen Hendrix for some time and denied knowing Porier. The officers asked the boys to show them where their parents lived. In the car the two were told that Roger Dale Porier was suspected of a very serious crime, killing a police officer. At the Shelton residence, Lt. Phillips, Officer Casteel and Emfinger got out and Officer Liles was instructed by Lt. Phillips to stay in the car with Shelton. Officer Liles stressed the seriousness of the crime and told James if he knew anything about it or if he could help locate either suspect, he'd better go ahead and do it. At this point, according to Liles' testimony at the trial, tears came to Shelton's eyes and he said, "We did it. We did it. We were there. We were there."[1] Liles called to the other two officers, "We have a

---

[1] We note an ambiguity in Officer Liles' account of the words themselves which casts a serious cloud of doubt over their accuracy. Officer Liles testified at the trial that Shelton said, "We did it. We did it. We were there, we were there." But in his testimony at the suppression hearing he quoted Shelton as saying, "We were there. We were there. We know all about it." When the issue was pressed by the state, he testified the words were, "We did it. We did it." Officer Liles' thorough, detailed report made a few hours after the arrests, contains this exact account, which further clouds the proof:

> Just after Lt. Phillips and Deputy Casteel got out of the vehicle, the subject James R. Shelton asked me what this was all about. At that point, I stated to the subject that there had been a deputy shot and we were trying to locate anyone who might know something about a subject named Roger Dale Porier. The subject Shelton then broke down crying and stated: quote We were with him. We

witness," and at that point the Miranda warnings were given. Shelton and Emfinger were handcuffed and taken to the sheriff's office where detailed statements were given after the Miranda warnings.

██ The primary issue is whether or not the statement given to Liles in the police car was a result of custodial interrogation. If so, the statement should not have been admitted, as no Miranda warnings were given. If this can be classified as a voluntary, spontaneous statement, whether or not in custody, the warnings would not be required. *Hays* v. *State*, 274 Ark. 440, 625 S.W.2d 498 (1981); *Pace* v. *State*, 265 Ark. 712, 580 S.W.2d 689 (1979). Nor are warnings required if the questioning by police is simply investigatory. *Parker* v. *State*, 258 Ark. 880, 529 S.W.2d 860 (1975); *Dickson* v. *State*, 254 Ark. 250, 492 S.W.2d 895 (1973). Police inquiry is purely investigatory and proper until the suspect is restrained in some significant way. Once in custody however, no interrogation is allowed absent the Miranda warning and a knowing, voluntary waiver. *Parker* v. *State, supra; Miranda* v. *Arizona*, 384 U.S. 436 (1965). Here, appellant's remarks were not volunteered and spontaneous but the result of questioning, so the issue becomes whether under the circumstances the questioning would be deemed custodial interrogation. See *Parker, supra; Dickson, supra; Reeves* v. *State*, 258 Ark. 788, 528 S.W.2d 924 (1975).

██ In *Reeves* v. *State, supra*, we said, "Custodial interrogation means not only actual arrest but also any conduct that deprives a person of his freedom of action in any way. Furthermore, the test is an objective one." See also *Johnson* v. *State*, 252 Ark. 1113, 482 S.W.2d 600 (1972); *Parker, supra*. In *Reeves* the police came to defendant's home to inquire about a crime. They refused to obey the defendant's command and would not let defendant out of their sight. We found from an objective viewpoint that the defendant was in custody.

 In *Berkemer* v. *McCarty*, 104 S.Ct. 3138 (1984) the U.S. Supreme Court recently announced the test for determining custodial interrogations, a test similar to that in *Reeves*. "It is

were with him, we saw the whole thing unquote. (R. p. 929).

settled that the safeguards prescribed by Miranda become applicable as soon as a suspect's freedom of action is curtailed to a degree associated with formal arrest." A policeman's unarticulated plan has no bearing on the question whether a suspect was "in custody" at a particular time; the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation."

In *People* v. *P.*, 27 N.Y.2d, 286 N.Y.S.2d 225, 233 N.E.2d 255 (1967), cited with approval in *Berkemer*, the court points out that the purpose of the Miranda warning is to protect the individual's freedom of choice — to answer or not answer — in situations that are inherently coercive. The court went on to say:

> The vice of the custodial interrogation * * * [lies] in the psychological coercion implicit in interrogation in the isolated chamber from which the suspect may reasonably believe he cannot leave. In such circumstances the person detained or arrested finds himself completely and suddenly cut off from a freedom of movement. An involuntary immobilization by law enforcement officers dramatizes the fact that the individual stands suspected or accused of crime. Lacking knowledge of his constitutional rights, he may feel that he can extricate himself from the situation only by submitting to interrogation. He may reasonably believe that if he attempts to leave the interrogation chamber the authorities will impose immediate detention.
> * * *
>
> * * * We hold that custody occurs if the suspect is physically deprived of his freedom of action in any significant way or is led to believe, as a reasonable person, that he is so deprived." This is the test which we hold to be the most reasonable. It gives effect to the purpose of the Miranda rules; it is not solely dependent either on the self-serving declarations of the police officers or the defendant nor does it place upon the police the burden of anticipating the frailties or idiosyncrasies of every person whom they question.

In considering the application of this rule, we find two elements that heavily influence our conclusion — appellant's age and the place of interrogation. Although age is not an

overriding consideration, when reviewing the circumstances of a defendant's statement, *Douglas* v. *State*, 286 Ark. 296, 692 S.W.2d 217 (1985); *Smith* v. *State*, 286 Ark. 247, 691 S.W.2d 154 (1985), age has been seen as an important element in determining volition. *Little* v. *State*, 261 Ark. 859, 554 S.W.2d 312 (1977). The deference accorded adolescents has been recognized by the United States Supreme Court. *In Matter of Gault*, 387 U.S. 1 (1966), the court said:

> If counsel was not present for some permissible reason when an admission was obtained, the greatest care must be taken to assure that the admission was voluntary, in the sense not only that it was not coerced or suggested, but also that it was not the product of ignorance of rights or of adolescent fantasy, fright, ignorance or despair.

And in a pre-*Gault* decision, the court in holding the confession of a fifteen year old involuntary said that juveniles, ". . . cannot be judged by the more exacting standards of maturity. That which would leave a man cold and unimpressed can overcome and overwhelm a lad in his early teens." *Haley* v. *Ohio*, 332 U.S. 596 (1948). *In Matter of Hector G.*, 393 N.Y.S.2d 519, 89 Misc.2d 1081 (1977), the New York court stated, "Adolescents are more likely to succumb to the inherently coercive nature of police interrogation and the police should apply extra caution when dealing with juveniles."

■ Second, we note that interrogation in a police car has been considered a significant factor in finding an individual under custodial interrogation. 31 A.L.R.3d 365, Custodial Interrogation.

Although nearly eighteen chronologically, Shelton was of marginal intelligence and maturity. One of the officers thought he was younger than Emfinger, who was fourteen. They were awakened at 2:30 in the morning and summoned out of the bunkhouse by three officers using a P.A. system. Shelton had never been arrested or been in jail. The officers told them they were looking for the killer of Charles Barnes and expressed their concern for potential problems when they arrived at the parents' house. Shelton was then ordered by the senior officer to stay in the police car with another officer. It was in the police car that Shelton was interrogated, making the inculpatory remark after

being told by Officer Liles to tell what he knew.

[▮] After viewing the evidence as a whole, we conclude the statement made to Liles in response to the officer's direct inquiry was not properly admitted. We are influenced in part by the reaction of the trial judge, who recognized the uncertainty of the statements. At a hearing on Shelton's motion for a new trial, he said:

> I want to make one other comment. At the first of this trial I overruled a motion to quash the statements given by Mr. Shelton. I'm not changing my mind on it, but since I've had a chance to read this transcript and read the statements fully, I really wonder about whether I made the right ruling at that time or not. It may have been that I should have quashed these statements because, at the time of this statement to Officer Liles, Mr. Shelton had not been advised of his rights. With the credibility being such as it is now there is some serious question as to whether I erred in allowing that statement to come in to start with. The Supreme Court can review this transcript and they can determine whether I did err or whether I didn't err at that point. They also can review this testimony and determine what they think ought to be done, if anything.

[▮] Because of our conclusion as to the nature of the first statement, we must find the subsequent statement given at police headquarters should also have been excluded. When the original confession has been made under illegal influence, such influence will be presumed to continue and color all subsequent confessions, unless the contrary is clearly shown. *Woodward* v. *State*, 261 Ark. 895, 553 S.W.2d 259 (1977); *Matthews* v. *State*, 261 Ark. 532, 549 S.W.2d 492 (1977); *Payne* v. *State*, 231 Ark. 727, 332 S.W.2d 233 (1960). We added in *Matthews*, "The effect of earlier abuse may be so clear as to forbid any inference other than that the later confession is involuntary. On the other hand, one making a confession which is involuntary is not perpetually disabled from a making a voluntary confession after the conditions of abuse have been removed. Lapse of time is an important consideration."

In *Payne*, the appellant had been denied almost all basic procedural rights culminating with a threat by one of the officers

that a mob would arrive in a few minutes that wanted to "get him." We found the confession that followed involuntary as we did a subsequent re-enactment of the crime by appellant for the officers two hours later. In *Matthews*, appellant alleged physical abuse by police officers for which there was some corroboration by another witness. Appellant confessed to the crime but was never charged. Eleven months later, appellant was arrested on another charge and confessed. On appeal he argued the confession was involuntary as he was still under the coercive effects of the interrogation eleven months earlier. We found the previous incident was too remote to consider in connection with an interrogation about a wholly unrelated crime.

In this case, although prior to the second statement, appellant was carefully given his Miranda warnings and executed the appropriate waivers, we do not find sufficient dissipation of the coercive elements of the first confession was clearly shown. To the contrary, appellant was immediately handcuffed and driven to police headquarters where his formal statement was taken at about four o'clock in the morning. There was no lapse of time between the two statements and given the circumstances of appellant's original remarks, there was no substantial change in the environment where the second statement was given, nor events to interrupt or alter the effects of the conditions of the first statement.

We note that even under the more relaxed standard recently announced in *Oregon* v. *Elstad*, ___U.S.___, 105 S.Ct. 1285 (1985), we must still exclude the second confession. In *Elstad*, the Supreme Court considered the admissibility of confessions subsequent to statements given without Miranda warnings. The court changed its focus from an examination of attenuation, *Wong Sun* v. *U.S.*, 371 U.S. 471 (1963) and "letting the cat out of the bag," *United States* v. *Bayer*, 331 U.S. 532 (1947) to the nature of the first confession. In essence, *Elstad* holds that a first confession obtained without the Miranda warning will not exclude any subsequent confessions if the first confession was voluntary. "We must conclude that, absent deliberately coercive or improper tactics in obtaining the initial statement, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion. A subsequent administration of Miranda warnings to a suspect who

has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement." *Elstad* at 1296.

In *Elstad*, the police had gone to the defendant's home and asked his mother if they could talk to him. They had a warrant for his arrest and the state had conceded the defendant was in custody. She let the officers in and they spoke with the defendant in the living room. He was asked if he was involved in a certain robbery and he said, "Yes, I was there." He was then arrested and taken to police headquarters where a formal statement was taken. The court reasoned that the purpose of the Miranda rule is to avoid statements in inherently coercive situations and although the court agreed the first statement could not be used, it found the second formal statement was not tainted as it was not the product of a coerced statement.

In applying its rule to the facts in the case the court said: "It is . . . beyond dispute that respondent's earlier remark was voluntary within the meaning of the Fifth amendment. Neither the environment nor the manner of either interrogation was coercive. The initial conversation took place at mid-day, in the living room area of respondent's own home, with his mother in the kitchen area a few steps away. Although in retrospect the officers testified that respondent was then in custody, at the time he made his statement he had not been informed he was under arrest."

The facts in the case before us are in contrast to those in *Elstad* which led the Court to conclude the first statement voluntary. As in *Elstad*, the first statement given by appellant to police was in custodial interrogation, but in *Elstad*, the Court found none of the coercive elements of custodial interrogation were present. Here, as discussed earlier, it was the inherently coercive nature of this situation which *created* the custodial setting and without the Miranda warning removed appellant's freedom of choice and action. We cannot say under these circumstances that the first statement was knowingly and voluntarily made.

## II

The other point which warrants reversal concerns the exclusion of character evidence. The defense attempted to

elicit from Joe Singletary evidence of James Shelton's character in the form of opinion testimony and by specific instances of conduct. The trial court would allow neither and instructed the defense that character could be established only by proof of reputation in the community. Rules 404 and 405, Arkansas Uniform Rules of Evidence, provide that evidence of a person's character is not admissible to show he acted in conformity therewith, except that the accused may offer proof of a pertinent character trait and the prosecution may rebut that proof. Where admissible, the proof may be made by testimony as to reputation and, on cross-examination, into specific instances of conduct.

 The court was right to exclude proof of character through specific instances of conduct on direct examination, but should have admitted opinion evidence of a "pertinent trait." A "pertinent trait" has been held to mean "relevant," defined in Unif. R. Evid. 401 as any evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence. *U.S.* v. *Staggs*, 553 F.2d 1073 (7th Cir. 1977). The prevailing view limits pertinent traits to those involved in the offense charged — proof of honesty in a theft charge or peacefulness in a murder charge. McCormick on Evidence (3rd Ed. 1984). However, it is necessary to allow evidence of defendant's character, as testimony that the general estimate of his character may be so favorable the jury could infer he would not be likely to commit the offense charged. This may be particularly valuable, since that testimony alone may be enough to raise a reasonable doubt of guilt in the minds of the jury. Weinstein's Evidence, Vol. 2, § 404[02].

 In this case, the defense proffered opinion evidence that Shelton was not a discipline problem and had an aversion to violence. Both of these traits — probative of a law abiding and non-violent nature — have been traditionally admissible in a murder case and should have been admitted. See McCormick, *supra* § 191; *Finnie* v. *State*, 267 Ark. 638, 593 S.W.2d 32 (1980). The defense also sought to introduce evidence of Shelton's immaturity and limited intelligence. Both traits were relevant to a lack of intent — a crucial issue here, since the jury had to determine whether Shelton was simply an observer or an active participant in the crime. Although relevance of evidence is

within the discretion of the trial judge, because of the critical nature of the evidence we think the probative value would not be outweighed by any danger of confusion or loss of time.

## III

We find no error in other points argued but necessarily address them for purposes of remand.

### A

Appellant argues the court erred in denying three motions for funds. He first submits that Ark. Stat. Ann. § 43-4219, which authorizes and limits the amount of funds for payment of defense counsel and investigation services for indigent defendants, is so inadequate as to be unconstitutional. We considered this issue in *State* v. *Ruiz & Van Denton*, 269 Ark. 331, 602 S.W.2d 625 (1980) and upheld its constitutionality. Although we expressed concern that the statute does not allow for adequate compensation in some cases, we said the remedy must remain in the province of the legislature.

### B

Appellant also asked for deposition expenses. § 43-2011 permits the trial court to authorize a defendant to take depositions of material witnesses under certain circumstances and with certain procedures to be followed by the defendant. § 43-2011.1 allows for payment of the indigent's attorney for expenses connected with any depositions taken. It is not clear from either appellant's motion or his argument just what request he was making, but at the most it appears to be a generalized request for deposition funds for which there is no statutory authority. Nor did appellant follow the procedures for deposition requests set out in § 43-2011. "It is well settled that the right to take a deposition rests upon statutory authority and in no case can that right be exercised unless that authority exists." *Kelly* v. *State*, 7 Ark. App. 130, 644 S.W.2d 638 (1983); *Russell* v. *State*, 269 Ark. 44, 598 S.W.2d 96 (1980). Under these circumstances we find no error in the court's refusal of the request.

## C

Appellant's third request was for funds for an independent psychological evaluation. Ark. Stat. Ann. § 41-605 provides for psychological evaluation when the defense involves mental disease or defect or the defendant's fitness to proceed is in issue. We said in *Ball* v. *State*, 278 Ark. 423, 646 S.W.2d 693 (1983) that the purpose of this statute is to prevent the trial of any person while incompetent to understand the nature of the procedures involved and to assist in the defense thereof, as well as to prevent the trial of a person who lacks the capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law at the time of the offense. Appellant did not raise the defense of either mental disease or lack of fitness to proceed, but only wanted to present expert testimony on the issue of immaturity and intelligence level. There was no authority for the court to authorize such a request nor is the purpose one of constitutional proportions. Youthfulness, immaturity and intelligence are all matters that can properly be presented to the jury for consideration as mitigating circumstances, but are not constitutionally recognized defenses requiring state funding. Appellant was not prejudiced in any case, as a psychologist was obtained by the defense and testified in appellant's behalf.

## D

Appellant maintains the trial court should have disqualified the prosecutor. He argues the prosecuting attorney was closely involved with the sheriff's department where the deceased officer worked. As the decision to try appellant as a juvenile was within the discretion of the prosecution, appellant argues the close working relationship between the two departments prevented the prosecution from making an unbiased determination on that issue. Appellant cites no authority or proof for this proposition and we are not persuaded it is the basis for compulsory disqualification. *Perry* v. *State*, 277 Ark. 357, 642 S.W.2d 865 (1982).

## E

Appellant contends it was error to deny his motion to transfer the case to juvenile court. The only support for his

argument is that Gene Emfinger was tried as a juvenile and that appellant had a lower functioning maturity level. However, we have not looked to mental age to determine criminal culpability. *Allen* v. *State*, 253 Ark. 732, 488 S.W.2d 712 (1973). Appellant was seventeen at the time of the crime, had finished the ninth grade and held a job. Although the record reflects appellant's immaturity, that in itself is not sufficient to show an abuse of discretion in charging appellant as an adult.

## F

 Appellant proposes that we reverse our holding on permitting death qualified juries. See *Rector* v. *State*, 280 Ark. 885, 659 S.W.2d 168 (1983). However, we have reaffirmed our position since the Eighth Circuit Court of Appeals affirmed *Grigsby* v. *Mabry*, 758 F.2d 226 (8th Cir., 1985), see *Hendrickson* v. *State*, 285 Ark. 462, 688 S.W.2d 295 (1985), and we decline to change our position.

## G

 Appellant next claims error in the admission of evidence concerning the burglary that took place just prior to the shooting of the officer. A prior act is admissible if it tends to show intent, plan or motive under Unif. R. Evid. 404(b), or where acts are intermingled and contemporaneous with one another, the evidence with respect to any and all of them is admissible to show the circumstances surrounding the whole criminal episode. *Love* v. *State*, 281 Ark. 379, 664 S.W.2d 457 (1984); *Lair* v. *State*, 283 Ark. 237, 675 S.W.2d 361 (1984). The evidence was properly admitted. Here the state was arguing the motive for killing Officer Barnes was to avoid discovery of the burglary, while appellant was contending he was only a witness to the shooting. Evidence of the burglary was admissible to show motive and intent. *Henry* v. *State*, 278 Ark. 478, 647 S.W.2d 419 (1983). Additionally, the time of the burglary and the murder was probative of an ongoing, uninterrupted course of conduct. *Hobbs* v. *State*, 277 Ark. 271, 641 S.W.2d 9 (1982); *Love* v. *State, supra*; and see, *Rowdean* v. *State*, 280 Ark. 146, 655 S.W.2d 413 (1983).

## H

██ ██ Appellant urges his motion for a directed verdict and a new trial should have been granted, there being no substantial evidence on which to base the verdict. When we view the evidence in the light most favorable to the appellee, we think it was sufficient. Appellant participated in a burglary shortly before the murder; he was at the scene of the murder when it occurred; there was testimony from the officer who took his fingerprints that appellant voluntarily relayed the events of the night and in describing the shooting said he and Emfinger removed the officer's weapon from its holster before Porier shot him. In considering the sufficiency question we must also consider both statements given to the police, even though we have found them inadmissible. *Harris* v. *State*, 284 Ark. 247, 681 S.W.2d 334 (1984). In light of that, we cannot say as a matter of law the circumstantial evidence could not support a verdict. See *Henry* v. *State, supra.* One need not take an active part in a murder to be convicted if he accompanies another who actually commits the murder and assists in such commission. *Henry* v. *State, supra. Hallman & Martin* v. *State*, 264 Ark. 901, 575 S.W.2d 688 (1979).

## I

██ Another statement attributed to him which Shelton would have suppressed was provided by Ms. Judy Montani, the jailer who fingerprinted Shelton and Emfinger. She said Shelton told her "they" (evidently referring to Emfinger and himself) removed the pistol from the officer's holster and handed it to Porier. She said they told her they got in the car and they yelled at Porier not to kill the deputy. It was abundantly clear from Ms. Montani's testimony that appellant's remarks were not in any way solicited by her but were voluntary and spontaneous admissions. There was no error in their admission. *Hays* v. *State, supra; Pace* v. *State, supra.*

## J

██ Appellant's final argument is that it was error to exclude testimony of witnesses that Porier had an independent motive in the shooting — an avowed hatred of law enforcement officers. Appellant argues that contrary to the state's theory that

the motive for the shooting was related to the burglary, Porier had an independent motive. Of course, proving that Porier had a motive of his own would not necessarily negate any motive on the part of appellant. The court excluded the evidence and commented there was already sufficient evidence that would allow the jury to conclude Porier was a wholly undesirable character. We cannot say it was an abuse of discretion to exclude the evidence, particularly if it was simply cumulative of other proof. Unif. R. Evid. 401, 402; *Hamblin* v. *State*, 268 Ark. 497, 597 S.W.2d 589 (1980).

The judgment is reversed and remanded.

PURTLE, J., not participating.