David JOHNSON *v.* STATE of Arkansas

CR 91-121 823 S.W.2d 800

Supreme Court of Arkansas
Opinion delivered January 21, 1992

8

*Smith & Smith*, by: *Robert Smith*, for appellant.

*Winston Bryant*, Att'y Gen., by: *Olan W. Reeves*, Asst. Att'y Gen., for appellee.

ROBERT H. DUDLEY, Justice. The appellant was convicted of capital murder and sentenced to death by lethal injection. Upon review of the points assigned as error by the appellant, and upon our own comparative review of other death penalty cases, we affirm the judgment of conviction as well as the sentence imposed.

Even though the appellant does not contest the sufficiency of the evidence, we detail the facts for the purpose of making a comparative review of other cases in which we have affirmed the death penalty. We do so to be assured of the evenhandedness of the application of the death penalty. *See Collins* v. *State*, 261 Ark. 195, 548 S.W.2d 106 (1977) and *Collins* v. *State*, 280 Ark. 312, 657 S.W.2d 546 (1983) (Hickman, J., concurring). The victim in this case, Leon Brown, a sixty-seven-year-old male, first went to work for Little Rock Crate and Basket Company in 1967, worked there a few years, left, returned in 1982, and continued to work there until he was murdered. During the last few years he worked as a night watchman only on Friday and Saturday nights. On the evening of Saturday, September 2, 1989, while on duty, he wore a black leather John Brown type of police belt and holster to carry his .41 caliber Smith and Wesson pistol, and four (4) empty shell casings. He was known to carry the empty casings, although no one knew the reason. He also carried a watchman's clock, which is a device that looks something like an old-fashioned leather covered circular style canteen with a paper disc on the outside. As he made his rounds, he would stop at designated locations which had permanent station keys and insert one of the keys in his watchman's clock. It would punch a hole in the paper disc. That hole would reflect the time the watchman stopped at that particular station.

Little Rock Crate and Basket Company is located at 1623 East Fourteenth Street, which is at the end of Fourteenth Street in Little Rock. It manufactures fruit and vegetable containers, baskets, and wire bound crates. It consists of warehouses located on both sides of the street, a log yard, and an office which is located at the end of one of the warehouses. The office area, comprised of five (5) offices, is built of concrete blocks and has three (3) steel doors which were locked with dead bolt locks. It has windows which open into a lunchroom which is located at the end of the warehouses. The warehouses are built of corrugated steel, and on September afternoons, it gets hot inside them, so it was not

unusual for the workers to open the warehouse doors to cool the building. The doors were so opened at 6:30 on the evening of September 2, 1989. Even so, one would not worry about security because Fourteenth Street at that location is a private street, owned by Little Rock Crate and Basket, with no through traffic, and the business is surrounded by a high chain link fence with barbed wire on top.

Leon Brown had a number of friends who worked at Little Rock Crate and Basket Company, and he enjoyed going to work a little early so he could visit with them. His night watchman's shift began at 4 p.m. on the 2nd. He went in early and visited with his friends and then, at work time, began his rounds.

Dudley Swann, the principal stockholder in Little Rock Crate and Basket, received a call from a customer at about 4:30 in the afternoon on the 2nd. The customer wanted some crates delivered immediately, and Swann had to find truck drivers who were willing to work on the Labor Day weekend. He was at his home when he received the customer's call and did not have the drivers' telephone numbers there, so he went to the plant to get the telephone numbers. As he drove up to the company office area at about 6:30 that evening, he saw a white Delta 88 Oldsmobile automobile stuck in the drainage ditch beside the private street. The rear wheels of the car were spinning, and the tires were smoking. Swann parked his car, walked over to the white Oldsmobile, and told the driver he was tearing up his car. He asked the driver to leave and come back the next day to get his car because he did not want the driver on the premises after dark. Swann later identified appellant as the driver of the white Oldsmobile.

Swann went into the building with the offices and there saw Leon Brown on duty. He told Brown about the white Oldsmobile and stated that he had asked the driver to leave and come back the next day to get his car. Swann went into his office and, over about a fifteen-minute period, got the telephone numbers. He left the office area and went into the lunchroom area and again saw Brown. He asked Brown if the driver had left, and Brown motioned toward a pay telephone located on the wall. Swann looked there and saw the appellant. He went over to him and said, "I thought I asked you to walk on out." The appellant replied,

"Yes sir, I am in just a moment. I need to make one or two telephone calls to try to find some friends but they're all at work." Brown told Swann, "Don't worry about anything. Everything's all right." Swann made a note of the license plate number on the white Oldsmobile and left at 6:50 p.m.

The next morning, Sunday, the 3rd, at 7:15, George Wood, another part-time watchman, came to Little Rock Crate and Basket Company to check on Brown, as he usually did. He stood outside and called out for Leon Brown. There was no response and he waited ten (10) or fifteen (15) minutes for Brown to complete one of his rounds, but Brown did not appear. By then, Lawrence Sloan had come to work the day watch, and after about fifteen (15) minutes more, the two of them decided to go in the building. The gate was locked, but they went around to one of the doors that had been left open to cool the building the evening before. Just inside the building, in the lunchroom area, where Swann had last seen the appellant and Brown, they saw Brown's body. Lawrence Sloan's initial response graphically described the scene: "Ooh, somebody done beat Leon's brains out." Leon Brown's motionless body was lying face-down in a large pool of blood. He had been bludgeoned to death with a piece of 2" x 4" board that was found near his body. Three (3) of the blows to his head were made with such force that his skull was crushed, part of it was dislodged and rammed into his brain, and his brain was crushed. The medical examiner estimated that the blows to the head were so forceful that 300 to 400 pounds of pressure per square inch had been inflicted on his skull. An image of the extent of the damage to the victim's skull is created by the fact that upon arriving at the scene experienced detectives thought the victim had been shot in the head. His false teeth were found six feet away from his head, and his glasses were found past his feet.

The vending machines in the lunchroom area had been turned over and broken into. The windows into the office area had been forced open and the offices had been entered. Papers had been strewn about, desk drawers had been opened, and the pay telephone had been torn off the wall. Among the missing items were a typewriter, a Sharp brand calculator, two (2) cameras, tools, three (3) pistols, a fountain pen, a briefcase, a television set, three (3) Motorola brand handheld radios, and a battery charger.

The police were called; they quickly responded and immediately began their investigation. Among their procedures, officer Todd Vint was assigned to watch the white Delta 88 Oldsmobile automobile that was still stuck in the ditch. At about 11 o'clock that morning, the 3rd, a blue and white pickup stopped beside the white Oldsmobile, and three (3) people got out and began to try to get the Oldsmobile out of the ditch. The three (3) were Terrie Dickerson; her father, Elmer Richardson; and the appellant. Dudley Swann saw them and told officer Vint that appellant was the man he had seen the evening before, first trying to get the car out of the ditch and then later inside the building.

Police work developed many additional facts which were subsequently proven at trial. Steve Rowell told the police he was the manager of Lucky's Seafood in Little Rock and that appellant worked there and was supposed to report for work at either 4:00 or 5:00 p.m. on the 2nd but did not do so. At a few minutes after 7:00 p.m. on the 2nd, the appellant had called Rowell and told him that he could not come to work because he was in jail. In fact, he was not in jail, and at that time, the police were not looking for him.

Robert Sanders told the police that he saw a low-slung black car parked in front of Little Rock Crate and Basket Company a little after 9:00 on the night of the 2nd.

Terrie Dickerson told the police that, at about 11:00 on the morning of the 2nd, before the murder, the appellant came to her house and told her that his car was out of gasoline. He asked to borrow her car. She stated that he owned a low-slung black Oldsmobile Cutlass automobile. She loaned him her white Oldsmobile Delta 88. He left in her car, came back about 2:30 that afternoon, and left again in her car at about 2:45. She did not see him again until about 9:00 that night, the 2nd, when he returned on foot and told her that the police had been chasing him and that he had gotten her car stuck in a ditch. In fact, the police were not chasing him. He left her house afoot, but later came back in his low-slung black car, and brought into her house three (3) Motorola brand handheld radios and a Sharp brand calculator. Later, she went with him when he drove his black car to Priscilla Marshall's house. At that time she saw some guns and tools in his car. He took the guns and tools into Priscilla's house. The next morning, September 3, Terrie and the appellant went to the home

of Terrie's father, Elmer Richardson. They asked him to drive them to the Little Rock Crate and Basket Company so they could get Terrie's white Oldsmobile out of the ditch. As they drove up in his pickup truck, they were spotted by Officer Vint; appellant was identified by Dudley Swann and was arrested by the police. Subsequently, the radios and calculator were recovered from Terrie's house. They were identified as part of the property taken from the Little Rock Crate and Basket Company.

Priscilla Marshall told the police that the appellant came to her house on the morning of the 3rd, told her that his girlfriend was moving to North Little Rock, and said he needed to store some guns and tools. From her house the police later recovered the battery charger, a .38 caliber pistol, a Magnavox brand television set, cameras, tools, a fountain pen, and Leon Brown's .41 caliber Smith and Wesson revolver. Each of the items was identified as property taken from Little Rock Crate and Basket.

Connie Manuel testified that the appellant came to her house at about 10:00 on the night of the 2nd, remained a few minutes, left, and came back between midnight and 1:00 a.m. on the 3rd. At that time, he washed his clothes and took a bath. He spent the rest of the night with her. Her mother, Luella Shavis, gave the washed clothes, including his tennis shoes, to the police.

A police officer, Jack Matlock, found one of appellant's palm prints on the coin box which had been ripped out of the soft drink vending machine in the lunchroom area, and removed one of his fingerprints from the inside of an office window. Both prints were positively identified as being appellant's. Appellant's tennis shoes, which had been recovered from Luella Shavis, had human blood on them, but it was not in sufficient quantity to type. Hair samples found on the 2" x 4" board were compatible with the hair of Leon Brown. The paper disc from the watchman's clock reflected that Leon Brown did not make his round through the building at 7:00 p.m. on September 2.

The appellant did not testify at trial. One defense witness, Ella Mae Richardson, testified at the guilt phase of the trial that the appellant phoned her at 5:00 or 5:30 p.m. on the 2nd, and another witness, public defender Llewellyn J. Marczuk, testified that detective Mark Stafford told him that the appellant might not have committed the crime alone. The detective denied making

the statement. The other defense witness took the Fifth Amendment.

After hearing the above testimony, the jury unanimously found the appellant guilty of capital murder. The punishment phase of the trial was then held, and the jury found one aggravating circumstance, that the murder was committed for pecuniary gain, and one mitgating circumstance, that the appellant was a model prisoner and could conform to prison life and be a productive member of the prison society. The jury weighed the two and unanimously determined beyond a reasonable doubt that the aggravating circumstance outweighed the mitigating circumstance and determined that appellant should be sentenced to death by lethal injection. Pursuant to Ark. Code Ann. § 5-4-603 (a), the jury is required to return written findings. For some unknown reason, the record contains only part of the required written findings, but that has not caused us any difficulty in reviewing the matter since the record reflects that the jury foreman read the findings aloud and each juror stated aloud that the foreman had correctly stated his or her individual finding.

In summary, the proof is overwhelming that appellant savagely murdered Leon Brown for pecuniary gain. The real issue is whether the wickedness, inhumanity, and heinousness of this murder for pecuniary gain case is comparable with that of other cases in which we allowed the sentence of death to stand. We have concluded that it is comparable to the cases of *Whitmore* v. *State*, 296 Ark. 308, 756 S.W.2d 890 (1988); *Fretwell* v. *State*, 289 Ark. 91, 708 S.W.2d 630 (1986); and *Woodard* v. *State*, 261 Ark. 895, 553 S.W.2d 259, *cert. denied*, 439 U.S. 1122 (1977). Accordingly, we hold that the sentence of death was not freakishly or arbitrarily applied, and we will not, on our own motion, set aside the sentence. For statistical purposes, we note that both the victim and the appellant are black persons. *See Fretwell* v. *State*, 289 Ark. 91, 708 S.W.2d 630 (1986) (Hickman, J., concurring).

We now address the appellant's assignments of error. The first involves the statute under which he was charged. He contends that the capital murder statute Ark. Code Ann. § 5-10-101(a)(4) (Supp. 1991) is facially unconstitutional under the Eighth and Fourteenth Amendments because it fails to narrow the class of persons eligible for the penalty of death.

The statute, as amended in 1989, provides:

> (a) A person commits capital murder if:

> (4) With the premeditated and deliberated purpose of causing the death of another person, he causes the death of any person.

The major premise of appellant's argument is that premeditation and deliberation are not required to exist for any particular length of time, *see e.g., Ward* v. *State*, 298 Ark. 448, 452, 770 S.W.2d 109, 111 (1989), and as a result, almost any charge embracing a murder becomes a death eligible case. His minor premise is that the narrowing function is performed at the guilt phase of the bifurcated trial, and thus, he concludes the statute has "absolutely no narrowing mechanism."

The appellant cites *O'Rourke* v. *State*, 295 Ark. 57, 746 S.W.2d 52 (1988) for his minor premise that a narrowing of the death eligible class occurs during the guilt phase of the trial. We did so write in *O'Rourke*, but that opinion discussed an earlier version of the statute. We did not discuss the possibility of the narrowing occurring in the penalty phase because we did not have to. But the statute has been changed, and under the current statute, the narrowing primarily occurs in the penalty phase of the trial. The issue then is whether it is constitutionally permissible for the narrowing of the death eligible class to occur at the penalty phase of the bifurcated trial. The Supreme Court of the United States has clearly answered the issue.

In *Lowenfield* v. *Phelps*, 484 U.S. 231 (1988), the opinion of the Court provides that the narrowing function required for capital punishment statutes may be provided in either of two (2) ways: The legislature may itself narrow the definition of the crime so that the finding of guilt in a death penalty case is necessarily a narrow finding, or the legislature may more broadly define capital offenses and provide for the required narrowing by jury findings of aggravating circumstances at the penalty phase. The legislature previously narrowed the class in both ways but, under the 1989 amendment, has broadened the definition of the crime so that the narrowing now primarily occurs at the penalty phase.

Ark. Code Ann. § 5-4-603(a) (1987) provides:

(a) The jury shall impose a sentence of death if it unanimously returns written findings that:

(1) Aggravating circumstances exist beyond a reasonable doubt; and

(2) Aggravating circumstances outweigh beyond a reasonable doubt all mitigating circumstances found to exist; and

(3) Aggravating circumstances justify a sentence of death beyond a reasonable doubt.

■ The foregoing statute provides for the narrowing in the penalty phase of the trial. The Constitution requires no more than a narrowing of the death eligible class in the penalty phase of a bifurcated trial. *Lowenfield* v. *Phelps, supra.*

■ The appellant next makes a "double counting" argument. He contends that the duplicate use of pecuniary gain as part of the definition of the offense and also as an aggravating circumstance violates the Eighth Amendment. His argument is based upon the case of *Collins* v. *Lockhart,* 754 F.2d 258 (8th Cir. 1985). The appellant has no standing to raise the argument. As previously stated, he was charged with, and convicted of, capital murder as set out in Ark. Code Ann. § 5-10-101(a)(4) (Supp. 1991), that is, "premeditated and deliberated" murder. The murder for pecuniary gain was considered only as an aggravating circumstance in the penalty phase under Ark. Code Ann. § 5-4-603(a) (1987), quoted above. Thus, there was no double counting. Further, *Collins* v. *Lockhart, supra,* was effectively overruled in *Lowenfield* v. *Phelps,* 484 U.S. 231 (1988), and the Eighth Circuit Court of Appeals so held in *Perry* v. *Lockhart,* 871 F.2d 1384, 1393 (1989), *cert. denied* 493 U.S. 959 (1989). *Accord Singleton* v. *Lockhart,* 871 F.2d 1395, 1401 (1989), *cert. denied,* 493 U.S. 874 (1989) and *O'Rourke* v. *State,* 295 Ark. 57, 64, 746 S.W.2d 52, 56 (1988).

■ The appellant next argues that "the Arkansas capital murder statutory scheme becomes a mandatory death statute, and as such, is unconstitutional because it does not allow the jury to show mercy to a particular defendant." We most recently rejected this argument in *Hill* v. *State,* 289 Ark. 387, 713 S.W.2d 233 (1986). There, quoting from *Clines, Holmes, Richley &*

*Orndorff* v. *State*, 280 Ark. 77, 82, 656 S.W.2d 684, 686 (1983), we wrote: "[W]hatever the jury may find with respect to aggravation versus mitigation, it is still free to return a verdict of life without parole, simply by finding that the aggravating circumstances do not justify a sentence of death."

The appellant's next assignment of error involves the appeals process in death cases. In *Franz* v. *State*, 296 Ark. 181, 754 S.W.2d 839 (1988), we explained that a defendant in a capital case has an unqualified right to appeal, but if competent, he may waive that right. Because of that, the appellant argues that the appeals process in death penalty cases is unconstitutional because there is no mandatory appeal. The appellant has no standing to raise the issue. He had an unqualified right to appeal and has exercised it. It is immaterial that someone else might waive his or her right to appeal. In order to establish standing to challenge a statute or a court rule, a party must demonstrate that he is possessed of a right upon which the statute or rule infringes, and that he is within the class of persons affected by the statute or rule. *Thompson* v. *Arkansas Social Services*, 282 Ark. 369, 669 S.W.2d 878 (1984), *appeal dismissed*, 469 U.S. 926 (1984). Appellant does not meet those qualifications.

The appellant's next assignment of error involves an amendment to the information. It came about in the following manner. On the first morning of the trial, the venire was in the courtroom, and the petit jury was to be selected. The first six (6) prospective jurors were temporarily seated in the jury box and the other jurors were excused from the courtroom for a short while. The trial judge asked the six (6) prospective jurors a number of general questions. See A.R.Cr.P. Rule 32.2. In doing so, he read the information to them so that he could see if any of them knew anything about the case or knew any of the witnesses or knew either the appellant or the victim. The information that was read by the trial judge charged that the appellant killed Leon Brown "by shooting him." Immediately after the judge read the information, the two (2) deputy prosecutors and the appellant's two (2) attorneys approached the bench. One deputy prosecutor, Melody LaRue, said, "It's not a shooting. It's a beating." The other deputy prosecutor, Mark Fraiser, said, "That's what it says but it's not supposed to." The trial judge asked, "How did it happen?" and deputy prosecutor Melody LaRue responded, "He

was beaten to death." The trial court then announced, "The prosecutor advises me I'm wrong. The death did not occur by shooting. It was by a beating of some kind. So, strike that from it. The death did not occur from a shooting but by blunt trauma or a beating of some kind." The State never sought to amend by interlineation or by substituted information. The appellant did not make a contemporaneous objection to the oral amendment of the information by the trial judge. Some time later (thirteen (13) transcript pages later) and after the trial judge had completed his general examination of the six (6) prospective jurors, he, the attorneys, and the first prospective juror were preparing to go into chambers for individual sequestered voir dire of the jurors by the lawyers. Out of the hearing of the first such juror, the following colloquy occurred:

THE COURT: Robert [Smith, a defense attorney], that information read by shooting. It's wrong. It's always been a beating hasn't it, the cause of death?

MR. SMITH: I'm going to hold them to the burden of proof of what they've got on the information.

THE COURT: Well, I amended it out there. so — That is the cause of death, isn't it?

MR. SMITH: I believe —

THE COURT: Huh?

MR. SMITH: —

COURT REPORTER: I can't hear you.

MR. SMITH: I believe that's what the medical examiner says.

THE COURT: But you're not surprised by the fact that it's a beating?

MR. SMITH: Oh, no, sir.

THE COURT: All right.

MR. SMITH: But you have amended it?

THE COURT: Well, I've explained it to them out there. I read it and it says shooting. Then she came up and

told me. And I said I was in error, that it is by — the cause of death is by beating instead of shooting.

MR. SMITH: But that's what they have on the information.

THE COURT: I know but it's amended as of now.

MR. SMITH: For the record I'd like to object to the fact it's been amended by the Court.

THE COURT: Well, I didn't amend it. That's just what they allege and that's what the autopsy shows and that's what you prepared for trial. So.

MR. SMITH: My whole point is that's what the information alleges.

THE COURT: Well, if you prepared your defense on the basis of a shooting and you are surprised by this change in it —

MR. SMITH: No, I'm not going to throw that at the Court. I'm not going to lie about that.

THE COURT: Okay. If you're on notice that's what it was —

MR. SMITH: Yes, sir.

THE COURT: Then it's not a material change. The cause of death doesn't change anything other than an element they prove as to how it occurred.

MR. SMITH: I would just like for the record to reflect that I object to the fact it's been amended.

THE COURT: Okay.

Much later (320 pages of transcript later) the following occurred:

MR. SMITH: I just want to get on the record that — I still want to make an objection on the record. I think this case needs to be dismissed now that the jury's been empaneled for the fact that the information states he was shot by a gun. I think they need to be held to that proof.

I realize that you have already ruled on this tentatively this morning. It's my view that only the grand jury or a prosecutor can file a criminal information and — Without any law backing me up. I don't know that. But I would anticipate the law being that the prosecuting attorney would be the only one that can amend an information.

I just want to clarify what the Court's ruling is today and make our objection if you are going to amend like you said.

THE COURT: The record — The record should show that this morning when I read the information I read that the deceased was killed by shooting and that at the conclusion of that statement the prosecutor told me that that was in error, that the deceased was beat to death. I immediately corrected it to the jury. There was no objection by the Defense. And later on —

MR. SMITH: There was.

THE COURT: There wasn't an objection, Robert. Now, if you're going to dig this hole, let's get in it together.

MR. SMITH: Yes, sir.

THE COURT: So, I said I was in error, that the State alleges that the deceased died as a result of a beating. Then, when we came back to do individual voir dire, I asked you about it and you said you were going to hold them to their burden of proof or to the allegation in the information. And I said, "But it was corrected out there and you didn't object then." And you said you were not surprised and that you were prepared to go forward and defend the case on the basis of that he was beaten to death and you were not surprised by that. You had the opportunity then to ask for a continuance or make an objection and you did neither.

MR. SMITH: If I can clarify, to the best of my recollection I did object. I do not deny that — that it was a — that it wasn't a surprise to me.

THE COURT: Well, the record, I think, will show that you didn't object.

And the record should also show that I did not amend it, that the prosecutor approached the Bench and said, "Judge, that's an error." I said, "That's what it is."

She said, "Well, it should be that he died as the result of a beating." So, I consider that an amendment by the prosecutor. I do not consider it a material change in the allegation and especially coupled with the fact that you tell the Court that you were prepared to defend the case on the basis of death as the result of a beating.

MR. SMITH: I understand.

The appellant argues that the trial court erred in orally amending the information. The trial judge did commit error, but we will not reverse because there was no contemporaneous objection and also because we are satisfied that the appellant suffered no prejudice.

The State asks us to affirm this point because the trial judge did not amend the information, but rather the deputy prosecutors effectively moved to amend the information to make it conform with the facts that all the attorneys knew would be proven. We do not so interpret the record. It is clear that the State did not actually amend the information to allege "by beating," either orally, by interlineation, or by substitute information. The State did not ask the trial court's permission to amend the information. The trial court did not grant leave to the State to amend the information and, significantly, the trial judge stated that he had amended it. Thus, we can only conclude that the trial judge did amend the information and that was wrong. A trial judge should never perform the duties of the prosecuting attorney. However, there was no contemporaneous objection and, as a general rule, we require such an objection before we will consider a matter on appeal. *Blaney* v. *State*, 280 Ark. 253, 657 S.W.2d 531 (1983). The reason is that the trial judge must be given an opportunity to timely correct the mistake. *Wicks* v. *State*, 270 Ark. 781, 606 S.W.2d 366 (1980). That opportunity, to timely correct the mistake, was not afforded the trial judge in this case, and we will not reverse. We recognize that there are certain exceptions to the contemporaneous objection rule in death penalty cases, *see Hughes* v. *State*, 295 Ark. 121, 746 S.W.2d 557 (1988), but this case does not fit within the exceptions since there

was no prejudice which would unquestionably cause us to grant post conviction relief. *See Hill* v. *State*, 275 Ark. 71, 628 S.W.2d 284, *cert. denied*, 459 U.S. 882 (1982). The amendment by the judge did not change the nature or degree of the crime charged, and the appellant's attorney admitted that the nature of the amendment was no surprise.

 Appellant next argues that the State did not prove beyond a reasonable doubt that he killed the victim "by shooting him" as charged in the information. The argument is without merit for two procedural reasons. First, it goes to the sufficiency of the evidence, and although the appellant moved for a directed verdict at the close of the State's case, he did not do so at the close of all of the evidence. He must do so to preserve the issue. A.R.Cr.P. Rule 36.21(b). Secondly, the information was amended as previously discussed, and the appellant only objected to the trial judge's amending the information. Thus, he did not preserve the issue for appeal. *Stephens* v. *State*, 293 Ark. 366, 738 S.W.2d 91 (1987).

The appellant next assigns as error the trial court's ruling that State's witness Scott Sherrill could testify. The point comes about in the following way. A.R.Cr.P. Rule 17.1 provides that the State must furnish to the defendant a list of the names of each of the witnesses it intends to call at trial and the failure to furnish the name of a prospective witness will prevent that witness from being called. *Williamson* v. *State*, 263 Ark. 401, 565 S.W.2d 415 (1978). The State did not furnish the name of Scott Sherrill but called him as a witness. The following colloquy then took place out of the hearing of the jury:

> MR. SMITH: [Defense attorney] We object to Mr. Sherrill testifying. He was not given as a witness for the State at any time. I have no idea what he's going to testify to. He was not disclosed to the Defense as a witness.

> MRS. LaRUE: [Deputy prosecutor] Your Honor, Mr. Sherrill has always been — always been the person from serology who tried to type the blood on the board.

> THE COURT: Did you tell him he was going to be a witness?

MR. SMITH: I had no idea, your Honor.

MRS. LaRUE: His laboratory analysis has been in our case file. I mean if Mr. Smith — Did you copy the case file?

MR. SMITH: Yeah.

MRS. LaRUE: You never received a copy of the lab analysis?

THE COURT: In all likelihood he's not going to hurt you. The last one helped you better than anything else you've got going for you. I'll keep him out if you don't want him. If he's got anything, they would have called him earlier.

MRS. LaRUE: Your honor, we have —

MR. SMITH: What is he going to testify to?

MRS. LaRUE: That the blood on the board is human blood and that it matches all the characteristics of Mr. Brown's blood, although he couldn't say conclusively that it is Mr. Brown's blood.

MR. SMITH: He's not going to testify anything about blood on David's clothes or anything?

MRS. LaRUE: No. Well, the tennis shoes.

Immediately thereafter, the questioning of the witness started. As can be seen from the above part of the record, the trial judge ruled that he would not allow the witness to testify if the appellant still objected, and the appellant did not respond. Thus, the issue was not preserved for appeal. However, even if the point had been preserved, we would not reverse because we have held that when a defendant is not prejudiced by the testimony of a witness called in violation of Rule 17.1, there is no reversible error. *Vasquez v. State*, 287 Ark. 467, 701 S.W.2d 357 (1985). There was no prejudice in this case. Scott Sherrill, a forensic serologist, testified that he examined the blood samples which came from the 2" x 4" board recovered at the scene, and that he examined appellant's clothes, including his tennis shoes, that had been washed. He said that he could identify the blood on the board as human blood and that it had some of the same

characteristics as the blood of the victim, but he could not identify it as the victim's blood. This testimony could not have prejudiced the appellant. The jury already knew that the bloody board had been found close to the victim's body. Dr. Fahmy Malak, the medical examiner, had already testified as follows:

Q. Could you tell in your autopsy how many wounds he sustained to his crown?

A. There was at least three blows to the crown of the head. They were inflicted from the left back to the right front and down.

Q. Okay. What type of object could cause that? Or how do you classify those type of injuries?

A. The case came to me as suspicious of gunshot wounds but it was the case. This was due to blunt trauma caused by a blunt implement or tool. There was no gunshot wound. It may be a two by four or a similar object. Simply we found some wood fragments in the brain. So, it most probably caused by a lumber or wood object.

Another witness, Gary Lawrence, a criminalist, found hair similar to that of the victim on the board. Scott Sherrill's testimony about the board was only cumulative. In addition, he testified that the blood on the tennis shoes was human blood, but there was not enough of it to type. Again, this testimony did not result in prejudice to the appellant. The jury already knew that the appellant had been at the scene of the murder, and had taken property from there to the various locations. The scene of the murder had a large amount of blood. Between midnight and 1:00 a.m., he went to Connie Manuel's house to take a bath and wash his clothes. Connie Manuel identified the tennis shoes as the ones the police took from her home, and the jurors could observe that they have a spot on them. Again, Sherrill's testimony was mostly cumulative, but it did add the fact that it was human blood. Thus, appellant was not prejudiced by the witness' testimony, especially when we consider the overwhelming weight of the other evidence of appellant's guilt. When the evidence of guilt is overwhelming and the error is slight, we can declare that the error was harmless and affirm. *Numan v. State*, 291 Ark. 22, 722 S.W.2d 276 (1987).

Appellant's last assignment of error concerns the

admission into evidence of photographs taken at the crime scene. The admissibility of photographs is in the sound discretion of the trial judge and will not be set aside absent an abuse of that discretion. *Owens* v. *State*, 300 Ark. 73, 777 S.W.2d 205 (1989). "Even inflammatory photographs can be admitted if they shed some light on any issue or are useful to the jury." *Id*. at 83, 777 S.W.2d at 210. Each of the photographs admitted into evidence shed light either on the violence done to the victim or else on the crime scene. They were useful to the jury's understanding of the case. Accordingly, the trial judge did not abuse his discretion in admitting the photographs.

Pursuant to Rule 11 (f) of the Rules of the Supreme Court and Court of Appeals of the State of Arkansas, and pursuant to A.R.Cr.P. Rule 36.24, an examination of the complete record has been made for any prejudicial error which may have been objected to below, but not argued on appeal.

There was such an error, but it does not constitute reversible error. During the penalty phase of the trial, the appellant called James R. Moneypenny, a doctor of philosophy in psychiatry, to testify that the appellant could successfully live in prison and not pose a danger to other inmates. As a foundation for this evidence of a mitigating circumstance, Dr. Moneypenny was asked about the appellant's background. He responded that, as a child, the appellant had lived in numerous places, and his family had experienced a great deal of turmoil, upheaval, drug use, and other problems. At that point, the deputy prosecutor objected "to his testifying what was told him." The trial court sustained the objection. The ruling was erroneous.

Ark. Code Ann. § 5-4-602(4) (1987), in pertinent part, provides:

> Evidence as to any *mitigating circumstances* may be presented by either the state or the defendant *regardless of its admissibility under the rules governing admission of evidence* in criminal matters, but the admissibility of evidence relevant to the aggravating circumstances set forth in § 5-4-604 shall be governed by the rules governing the admission of evidence in such trials. [Emphasis added.]

In *Hobbs* v. *State*, 273 Ark. 125, 617 S.W.2d 347

(1981), we said that, by the above quoted statute, the legislature did not intend to totally open the door to any and all matters simply because they might conceivably relate to mitigation, and that, under the statute, direct testimony should be sworn, unless there were compelling reasons to not do so. But we did not intend to abrogate the statute. Clearly, the statute means that a psychologist can use a patient's history to give the patient's prognosis.

█ Even though the ruling was erroneous, no prejudice was suffered because the expert witness was able to express his opinion that the appellant could successfully live in a prison society, and the jury so held, and the facts concerning the appellant's background were fully developed for the jury by another witness, appellant's sister, Patrice Marcella Jackson Jenkins.

We affirm the judgment of conviction and the sentence of death.

BROWN, J., concurs.

ROBERT L. BROWN, Justice, concurring. Associate Justice Sherman Minton of the United States Supreme Court observed nearly forty years ago: "A defendant is entitled to a fair trial but not a perfect one." *Lutwak* v. *United States*, 344 U.S. 604, 619 (1953). The Court has ratified Justice Minton's view repeatedly over the years. *See, e.g., Delaware* v. *Van Arsdall*, 475 U.S. 673, 681 (1986); *United States* v. *Hasting*, 461 U.S. 499, 508-509 (1983); *Bruton* v. *United States*, 391 U.S. 123, 135 (1968). I subscribe to the maxim, and for that reason I concur in the majority's opinion.

Nevertheless, there were errors in this case that are troubling. First, the prosecutor filed an erroneous charge against the appellant that failed to identify the correct murder weapon or cause of death. This was not corrected until the day of the trial and only after the jury panel had been advised of the fallacious charge. Even at that time, it was erroneously corrected by the court and not by the prosecutor's amendment. Secondly, the prosecutor failed to provide the defense with the name of a key expert witness, Scott Sherrill, a forensic serologist, who was the only state witness to testify to human blood on the appellant's

tennis shoes. And, thirdly, the trial court erroneously limited the hearsay testimony of a psychologist testifying during the penalty phase on mitigating circumstances.

In reviewing potential prejudice to the appellant resulting from these errors, there is no question but that the defense counsel knew the correct instrument of death and prepared his defense on that basis. A closer question is presented by the serologist's surprise testimony that confirmed the presence of human blood on the appellant's tennis shoes. It is conceivable that Sherrill's testimony affected the appellant's case to some extent due to his counsel's inability to prepare adequately. By the same token, the other evidence against the appellant in this case was considerable. I cannot say that the prejudice is clearcut or conclusive from my review of the record. *See Hughes* v. *State, supra.*

Our rules are clear that we hold ourselves to a high standard in cases where death or life imprisonment is involved. *See* Ark. Sup. Ct. R. 11(f). Undoubtedly, the state does also in these cases. Failure to have a correct charge filed on the day of the trial or to provide defense counsel with the name of an expert witness before trial, though not prejudicial under these facts, falls somewhat short of this standard.