# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 99-2670EA

_____

David Dewayne Johnson,             *
*
         Appellant,            *
                                  *  On Appeal from the
     v.                      *  United States District Court
                                  *  for the Eastern District
                                  *  of Arkansas.
Larry Norris, Director, Arkansas    *
Department of Correction,        *
                                  *
        Appellee.             *

_____

Submitted: January 10, 2000

Filed: March 27, 2000

_____

Before RICHARD S. ARNOLD, FAGG, and HANSEN, Circuit Judges.

_____

RICHARD S. ARNOLD, Circuit Judge.

The petitioner, David Johnson, appeals the denial of his petition for a writ of habeas corpus. Although the District Court[1] denied the petition on all grounds, it

_____

[1]The Honorable James M. Moody, United States District Judge for the Eastern District of Arkansas.

granted a certificate of appealability on three issues: (1) whether evidence concerning trial counsel's bipolar disorder should have been considered only in evaluating his credibility, or, instead, as evidence of per se ineffective assistance of counsel, which rendered the trial fundamentally unfair; (2) whether the petitioner was denied his Sixth Amendment right to counsel because of an actual conflict of interest arising from his trial counsel's representation of the petitioner and a defense witness; and (3) whether trial counsel was ineffective during jury selection. We affirm the decision of the District Court on all three of these issues.

## I.

After a jury trial in 1990, the petitioner was convicted of capital murder. The jury found that the petitioner murdered Leon Brown, a sixty-seven-year-old night watchman at the Little Rock Crate and Basket Company. The evidence against the petitioner was strong: he was admittedly seen at the scene of the crime, items stolen from the crime scene were found in his possession, and physical evidence linked him to the place of the murder. The petitioner was sentenced to death by lethal injection. His conviction and sentence were affirmed on direct appeal to the Arkansas Supreme Court. Johnson v. State, 308 Ark. 7, 823 S.W.2d 800 (1992). His petition for writ of certiorari to the United States Supreme Court was denied. Johnson v. Arkansas, 505 U.S. 1225 (1992). His motion for post-conviction relief under Arkansas law was denied, and that decision was affirmed by the Arkansas Supreme Court. Johnson v. State, 321 Ark. 117, 900 S.W.2d 940 (1995).

At his trial and on direct appeal, the petitioner was represented by Robert Smith. The petitioner's issues before this Court all relate to Mr. Smith's representation. In 1993, Mr. Smith surrendered his law license. Between 1994 and 1996, he was convicted of various felony counts of property theft. He is currently serving a fifteen-year sentence in the Arkansas Department of Correction. During his testimony before

the District Court, Mr. Smith, for the first time, revealed that he had been diagnosed with bipolar disorder.

## II.

We first consider the question of whether evidence concerning Mr. Smith's bipolar disorder should have been considered only in evaluating his credibility, or whether it should have been treated as showing per se ineffective assistance of counsel which rendered the trial fundamentally unfair.

In his habeas petition, the petitioner cited numerous examples of Mr. Smith's conduct before and during trial which seem unprofessional, and perhaps bizarre. These included lying to the petitioner about his experience in capital cases, submitting a false application for malpractice insurance, being unprepared to present the petitioner's case, and appearing confused during trial. When Mr. Smith was testifying before the District Court about his performance, he stated that he had been diagnosed with bipolar disorder. He stated that according to his psychiatrist, this disorder is partly to blame for his legal problems. He stated that he was currently on medication for this disorder, which he would have to take for life. The petitioner attempted to obtain Mr. Smith's complete medical records, but Mr. Smith would not allow access to them.

To uphold a claim of ineffective assistance of counsel, a court must find that the counsel's performance was seriously deficient, and that the ineffective performance prejudiced the defense. Strickland v. Washington, 466 U.S. 668 (1984). However, the petitioner argues that he should not be held to the normal Strickland prejudice requirement. Rather, he says, Mr. Smith's bipolar disorder should be considered a structural error, which should require a per se presumption of prejudice. The petitioner relies on our decision in McGurk v. Stenberg, 163 F.3d 470 (8th Cir. 1998) (failure to notify the defendant of his right to a jury trial was structural error which did not require proving prejudice), and argues that other circuits have found structural error when

counsel is not mentally present at trial. See <u>Javor v. United States</u>, 724 F.2d 831 (9th Cir. 1984) (counsel was per se ineffective when he slept through substantial portion of trial); <u>Tippens v. Walker</u>, 77 F.3d 682 (2d Cir. 1986).

We note at the outset that there is some question as to whether Mr. Smith had bipolar disorder at the time of the petitioner's trial. Mr. Smith testified before the District Court that he was diagnosed with bipolar disorder "last year," Habeas Tr. at 72, which would presumably refer to some time in 1996. He testified that he did not recall having any of the symptoms of bipolar disorder in 1990, when the trial took place, but he attributed some of his actions in 1992 and 1993 to the disorder. <u>Id.</u> at 73-74. Petitioner offers instances of Mr. Smith's behavior during the petitioner's trial, which are consistent with Mr. Smith's behavior in 1992 and 1993, to prove that Mr. Smith was afflicted by bipolar disorder at trial. The District Court did not resolve this issue, noting that "Mr. Smith . . . reported . . . having been diagnosed with bipolar disorder which may or may not have manifested at the time of [the petitioner's] trial.".

Even if we assume that Mr. Smith's bipolar condition existed during the petitioner's trial, we decline to adopt the petitioner's proposed rule. This is not the type of structural error envisioned in <u>McGurk</u>, where we recognized the limited number of circumstances in which structural-error analysis was appropriate. Our Court has previously declined to adopt a rule requiring a per se presumption of prejudice with regard to mental illness. See <u>Pilchak v. Camper</u>, 935 F.2d 145,149 (8th Cir. 1991). Bipolar disorder, like most mental illnesses, can have varying effects on an individual's ability to function, and the disease can vary widely in the degree of its severity. We are not convinced there is anything about Mr. Smith's bipolar condition that would not lend itself to the normal fact-specific <u>Strickland</u> analysis. See <u>Bellamy v. Cogdell</u>, 974 F.2d 302, 308 (2d Cir. 1992). Any errors Mr. Smith made, even as a result of his mental illness, should be apparent from the face of the trial record, or otherwise susceptible of proof, and thus readily reviewable.

Therefore, using specific acts or omissions of counsel at trial, the petitioner must prove that Mr. Smith's performance was deficient and prejudicial. Evidence of his bipolar disorder can be considered in attempting to prove this. However, Mr. Smith's statements about his bipolar condition, made in 1996, are not particularly probative in proving deficient performance in 1991. The District Court was correct in reasoning that this evidence is most probative in evaluating Mr. Smith's credibility and state of mind, which are relevant to the petitioner's conflict-of-interest claim. The unprofessional and perhaps bizarre behavior that the petitioner now claims was a result of Mr. Smith's bipolar disorder includes lying to the petitioner about his experience in capital cases, submitting a false application for malpractice insurance, and a general lack of trial preparedness.[2] Whether a result of bipolar disorder, character flaws, or just bad lawyering, these examples do not rise to the level of constitutionally deficient performance, because they cannot be shown to have affected the outcome of the case.

Without the benefit of a per se presumption, evidence of Mr. Smith's bipolar disorder does not help the petitioner to establish Strickland prejudice. The petitioner cannot point to a single example of Mr. Smith's performance where there is a reasonable probability that the result of the proceeding would have been different if Mr. Smith had done something differently. Nor can the petitioner show that there is a reasonable probability that, absent any example of Mr. Smith's unprofessional behavior, the jury would have concluded that the balance of aggravating and mitigating circumstances did not warrant death. Strickland, 466 U.S. at 695. Even after we consider the evidence of Mr. Smith's bipolar disorder, the petitioner's ineffective-assistance-of-counsel claim fails.

---

[2]The petitioner makes more specific ineffective-assistance claims with regard to conflict of interest and jury selection. These will be addressed below.

III.

The second question the District Court certified for appeal is whether the petitioner was denied his Sixth Amendment right to counsel because of an actual conflict of interest arising from Mr. Smith's joint representation of the petitioner and Derrick Gilbert.

At trial, the defense had intended to use Derrick Gilbert as a witness. Gilbert was going to testify that another individual, Ford, had told Gilbert that Ford had sold certain items of stolen property to the petitioner.[3] This would explain why the items of stolen property were found in the petitioner's possession. However, Gilbert never testified. The prosecution had interviewed Gilbert, as a potential defense witness, prior to trial. When Mr. Smith attempted to call Gilbert at trial, the Court inquired as to what Gilbert's testimony would be. Mr. Smith responded that Gilbert would testify that Ford had told him that he had sold the stolen goods to the petitioner. The Court noted that such testimony would be inadmissible hearsay. Mr. Smith made no further argument to try to get the testimony admitted. Nevertheless, the Court was about to swear Gilbert in when the following exchange occurred:

> MRS. LaRUE (prosecuting attorney): I think at this time Mr. Gilbert is going to need an attorney. Mr. Fraiser and I went out and he informed us that if he testified today to what

---

[3]There is a discrepancy in the record as to what exactly Gilbert told Smith his testimony would be. At the District Court hearing, Gilbert testified that Ford claimed to have committed the murder and the robbery, and to have sold the stolen goods to the petitioner. In contrast, Smith has claimed throughout that Gilbert told him only that Ford had claimed to have sold the stolen goods to the petitioner. The District Court evaluated Smith's and Gilbert's credibility and all other evidence relevant to the claim that Ford committed the murder and robbery. In light of this, the Court explicitly rejected Gilbert's version of what he told Smith. We adopt this factual finding, as it is not clearly erroneous. See Battle v. Delo, 19 F.3d 1547, 1552 (8th Cir. 1994).

Mr. Smith has just said that he would testify to that he would be committing perjury.

MR. SMITH: Your Honor, I also have a problem with this in that I do represent Mr. Gilbert in Fifth Division.

THE COURT: Mr. Gilbert, why don't you go on and get out of here before you get yourself in trouble. They're not going to call you.

Trial Tr. at 760.

A claim for ineffective assistance of counsel arising from a conflict of interest does not require proof of the prejudice component of the Strickland test. Rather, the petitioner can establish a Sixth Amendment violation if he can demonstrate that "an actual conflict of interest adversely affected his lawyer's performance." Cuyler v. Sullivan, 446 U.S. 335, 348 (1980). To be within Cuyler, the petitioner must prove both that his attorney acted under an actual conflict of interest, as opposed to just a potential one, see Dawan v. Lockhart, 31 F.3d 718, 721 (8th Cir. 1994), and that the conflict of interest actually affected the adequacy of the representation. See Simmons v. Lockhart, 915 F.2d 372, 378 (8th Cir. 1990).

Even if we assume that an actual, as opposed to a potential, conflict of interest existed, the petitioner cannot show that this conflict of interest actually affected the adequacy of Mr. Smith's representation. The petitioner argues that Mr. Smith did not do all he could to get Gilbert's testimony admitted because Mr. Smith was protecting Gilbert's interests over the petitioner's. However, the weight of the evidence is against this interpretation of Mr. Smith's motivations. The District Court specifically found that a fear of prejudicing Gilbert's interests played no part in Mr. Smith's inaction. This factual finding was supported by an evaluation of Mr. Smith's credibility in his testimony before the District Court, and is not clearly erroneous.

Therefore, the petitioner does not receive the benefit of <u>Cuyler</u>, and must meet the <u>Strickland</u> ineffective-assistance-of-counsel test. This he cannot do. Even if Mr. Smith had properly argued for the admissibility of Gilbert's testimony under the hearsay exception found in Rule 804(b)(3) of the Arkansas Rules of Evidence (declaration against penal interest), it would not have made a difference. The Arkansas Supreme Court held that this exception would not apply, because there were no corroborating circumstances to indicate the trustworthiness of the statement. <u>Johnson v. State</u>, 321 Ark. 117, 125-26, 99 S.W.3d 940, 945 (1995). Therefore, there is no prejudice under <u>Strickland</u>.

## IV.

We turn to the final question the District Court certified for appeal: whether trial counsel was ineffective during jury selection by focusing on jurors' religious denominations and beliefs, and by failing to eliminate jurors who had recently served on a panel in another capital case which imposed the death penalty.

The petitioner argues that Mr. Smith's performance during voir dire was completely ineffective. The petitioner offers expert testimony that Mr. Smith's voir dire did not appear to have any direction or purpose. Through the testimony of two attorneys who worked with Mr. Smith, the petitioner argues that Mr. Smith's only discernible trial strategy was to seat an all-Catholic jury. Most seriously, the petitioner maintains that Mr. Smith's ineffectiveness was demonstrated by the fact that he did not question every potential juror about prior jury service. This resulted in the selection of four jurors (one of whom was an alternate) who had imposed the death sentence the previous week to sit on the petitioner's jury. The petitioner argues that these jurors would be predisposed to impose the death penalty, and that the rest of the jury could have been swayed by these three jurors.

Mr. Smith believed that the religious beliefs of Roman Catholics would make them less likely to impose the death sentence. During the sentencing phase of the case, he appealed to what he supposed to be the jurors' religious convictions. We assume for present purposes that this strategy, if it was worthy of the name, was seriously unprofessional. The assumption that every Roman Catholic is opposed to the death penalty, we think, is an unreasonable stereotype. The difficulty with the argument is that no prejudice can possibly be shown. We have no way of knowing who would have gotten on the jury if counsel had adopted a different strategy during voir dire, or if these hypothetical jurors would have been more favorable to petitioner.

The same reasoning applies to counsel's conduct in allowing three jurors to sit on petitioner's jury who had served on a jury that returned a death sentence the previous week. We have no trouble agreeing that no reasonable lawyer would have allowed this to happen, at least without making some kind of a record. There is absolutely no showing, however, that the three jurors in question were unfair to petitioner. We are unwilling to assume that someone who votes to sentence A to death will necessarily be inclined to impose the same sentence on B. The jurors' previous service does show that they were willing to impose a death sentence, but jurors absolutely unwilling to impose such a penalty are not qualified to sit. Neither the "Catholic strategy" nor the failure to challenge the jurors who had previously served can be shown to have had anything to do with the actual conduct of the jury in petitioner's case. In short, there is no reasonable likelihood that the result of petitioner's trial would have been different if counsel had behaved more prudently.

V.

This is in many ways an unfortunate case. Petitioner has been sentenced to death. The lawyer who tried his case may have been mentally ill at the time, failed to press vigorously for the admission of certain defense testimony, and pursued unprofessional strategies during jury selection. We nevertheless are convinced that the

governing law requires that this conviction and sentence be upheld. We deal in specific facts, not abstractions, and petitioner has failed to show any reasonable likelihood that the outcome of this case would have been different even if his lawyer had conducted himself perfectly. Accordingly, it is our duty to reject the petitioner's three contentions on appeal, and the judgment of the District Court is affirmed.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.