MICHAEL SZKLARUK *v.* OLGA SZKLARUK

5-5677                                          473 S.W. 2d 853

Opinion delivered December 13, 1971

*Tackett, Young, Patton & Harrelson,* for appellant.

*Henry C. Morris,* for appellee.

J. FRED JONES, Justice. This is an appeal by Michael Szklaruk from a decree of the Sevier County Chancery Court refusing to set aside a deed of conveyance from Michael Szklaruk to Olga Szklaruk and in impressing a trust on the land involved in favor of a daughter, Mary Jean Szklaruk. For convenience the principal parties will be referred to hereafter as the appellant and appellee. The appellant and appellee are naturalized Polish immigrants and met each other in a German concentration camp during the second World War. The appellant is

unable to read, write or speak English and the appellee speaks very little English. Both of these parties had living spouses from whom they were not divorced when they met each other in the concentration camp. The appellant was married to Olga Szklaruk, who is still living in Poland or East Germany, and the appellee was married to John Topar, a Polish soldier who apparently was killed during the war.

When the appellant and the appellee were released from the concentration camp at the end of the war, they emigrated to the United States together as husband and wife and the appellee assumed the name of the appellant's real wife, "Olga Szklaruk." One child a daughter, Mary Jean Szklaruk now 16 years of age, was born to the appellant and appellee and they have lived together as a family unit in Sevier County for a number of years. Stanley Topar, the appellee's son by her marriage to John Topar, also emigrated from Europe to Sevier County and lives near the appellant and appellee.

While living together as husband and wife in Sevier County, the appellant and appellee acquired 22 acres of land by deed to both of them as husband and wife. The purchase price of the land was $3,500 and the sum of $350 or $500 is still owed on the mortgage indebtedness. The parties also acquired seven head of cattle through the increase from one cow purchased by the appellee. Such was the background and situation when in September, 1970, the appellant and appellee ceased living together as husband and wife and the appellant indicated his desire to return to his wife in East Germany or Poland.

On September 18, 1970, the appellant and appellee went to the office of attorney John Hainen in DeQueen where the appellant signed a deed by his mark, transferring his interest in the 22 acres of land to the appellee. On September 25, 1970, the appellee filed suit in the Sevier County Chancery Court praying for a divorce from the appellant and for support money, mainly for their daughter. The appellant filed an answer and counterclaim. In his answer the appellant denied that he and

the appellee were ever married to each other. He admitted the birth of their child and the appellee's fitness to have custody of the child as alleged in the complaint. For his counterclaim the appellant alleged that the appellee knew he was unable to read, write or speak the English language, and through fraud, deceit and misrepresentation she obtained his signature or mark on the deed conveying his interest in their land to her, and that she did so for the sole purpose of depriving him of his property. The appellant prayed that the deed be set aside and that the court determine and award a reasonable amount for the support of the minor child.

From the evidence adduced at trial, the chancellor found that the appellant and appellee had never lawfully married and that the real property involved was owned by them as tenants in common rather than as an estate by the entirety. The chancellor further found that the deed of conveyance from the appellant to the appellee was not obtained by fraud or deceit, and that it was the intention of the appellant to convey the property to the appellee in trust for their daughter during her minority, with the title to vest in the daughter upon attaining her majority of 18 years. The chancellor further found the appellant to be the owner of the cattle involved, and he entered a decree as follows:

> "It is, therefore, decreed that plaintiff owns one-half the involved lands in fee and as trustee for the daughter, Mary Jean, the other undivided one-half interest until Mary Jean is 18 years of age when it will vest in Mary Jean. In the interim, possession is awarded to plaintiff and Mary Jean. All the cattle except the one old cow are vested in defendant."

On appeal to this court the appellant relies on the following points for reversal:

> "The Court erred in finding that a constructive trust was created and intended by Appellant.
>
> The Court erred in refusing to grant Appellant's Counterclaim to set aside the deed from Appellant

to Appellee because its execution was induced by fraud and a lack of consideration.

The Court erred in refusing to set aside the deed as it was not intended as a deed, but as a will."

Since we do not agree with the appellant's contentions under his second and third points, he is in no position to complain of the chancellor's finding as set out in the first point.

Questions of fact based on the preponderance of the evidence were all that were before the chancellor in this case, and although we try equity cases *de novo* on appeal, we affirm the decree of the chancellor unless it is against the preponderance of the evidence in the record. *Hunter v. Dixon, et al,* 241 Ark. 725, 410 S. W. 2d 389. Only the two parties to this action and Attorney Hainen, who prepared the deed, testified in this case. The appellant and the appellee testified through an interpreter. The chancellor found that no divorce was involved and that only the title to the land and cattle were before the court. The parties seem to agree with the chancellor on this point.

The appellee testified that their difficulty arose primarily because of the dislike the appellant and her son, Stanley, have for each other. She testified that the appellant executed the deed in Mr. Hainen's office at the time he was planning to return to Poland, and that she asked the appellant to deed his interest in the property to her so "she wouldn't lose it in case he got lost or killed down the road." She testified that both she and Mr. Hainen explained to the appellant what the deed was. She says that she gave the appellant nothing in exchange for the deed and that he gave her nothing, since the land belonged to her as she had made all the payments on it. She testified that when the appellant was planning to go to Poland, she was afraid he would not come back and she wanted him to deed the property to her (interpreter's quote) "so she wouldn't get everything taken away from her, so that's why he made the deed. She wanted it so the girl could have it." In answer to

a question as to why the appellant would give her the land, the appellee testified that the appellant asked her to borrow $1,000 from the bank because he couldn't talk good and couldn't read or write; that he asked her to borrow the money so that he could go to Europe, but she says she did not borrow the money because of her age. The appellee testified that she worked regularly and made all the payments on the land and felt that it actually belonged to her. She testified that the appellant paid nothing on the land nor did he help support her and the daughter. She testified that while she was living with the appellant she wanted to share everything equally with him.

The appellant testified that he paid one-half of the amount paid for the land and the appellee paid one-half. He testified that he did not know how much was still owned on the mortgage, but that when he left the home there was still $350 due on the mortgage. He testified that he recognized Mr. Hainen in court and that he first met him when the appellee picked him up on the street and told him to go to Mr. Hainen's office. He testified that he did not know what the appellee wanted him to go to the office for, but that he did go to the office and signed the deed but that he did not know what he was signing. When asked what was told him when he signed the deed, the appellant testified that the reason the appellee took him to the attorney's office was that (as related by the interpreter) "in case of his death everything would go to her, and at her death it would go to him, and that would be left for his family. He says if both die the girl would get it." When asked if he thought the instrument was a will, the appellant testified that he did not know; that the appellee just told him, "the reason he should sign over either on her or on him so they's both have something to say. In case both of them died the girl would get it and her people in Europe wouldn't come and get it." The appellant testified that it is difficult for him to find work because he is unable to speak English, but when he was not working for someone else, he worked around the home. He testified that he works part time at a chicken hatchery but does not work much. Sometimes two days and sometimes a day and a half.

He says that he is not supporting his daughter because he was in the hospital for awhile and does not make enough money to pay for her support. The appellant was unable to testify as to any specific amount he had earned or paid for the support of his daughter but said that he did what he could for her. He testified that he does not know what he paid on the property in money and work, but that he put in whatever he could. The appellant testified that the appellee purchased one cow and from that one cow they now have seven head. He says that the cattle belong to him.

Under questioning by the chancellor, the appellant testified as follows:

"THE COURT: Now, I'd like to ask him a question about this transaction concerning the last deed. Does he recall that meeting with Mr. Hainen? Does he recall executing the deed that Mr. Hainen prepared?

INTERPRETER: He says, 'no.'

THE COURT: Nobody told him it was a deed?

INTERPRETER: He says 'no.'

THE COURT: Did he think it was a will?

INTERPRETER: He says he don't know nothing. They just called him in and told him to sign the paper.

THE COURT: Why did he do it?

INTERPRETER: He says she told him to go to the lawyer's office. He didn't know what he was going up there for. She told him to sign that paper and he didn't know what it was for.

THE COURT: You ask him this. Was she with him at the lawyer's office when he signed the paper?

INTERPRETER: He says the reason he didn't know why he was going in there, she told him to a lawyer's office, and she told him it was suppose to be a will. He asked what it is and said it was suppose to be a will. That's what she was suppose to tell him, so he signed it as a will. He never know he signed a deed. He didn't even know what he was signing.

THE COURT: Then why did he sign it?

INTERPRETER: He says because she begged him so somebody else couldn't pitch in on it, so he signed it to keep it together.

THE COURT: Ask him if he told her he planned to go back behind the iron curtain into soviet territory.

INTERPRETER: He says he's an American citizen and he ain't going to leave the United States.

THE COURT: Had he ever told her he wanted to go back to Poland?

INTERPRETER: He says 'no, sir.' He told her he'd like to go up and come back.

THE COURT: For a visit?

INTERPRETER: Yes.

THE COURT: How was he going to pay for that visit?

INTERPRETER: He says he don't know how much it will cost. He hadn't tried it yet.

THE COURT: Did he have any money at the time he planned to make the trip?

INTERPRETER: He says 'no.' He said he would go to work and accumulate enough to go to work.

THE COURT: Did he ask her for any money?

INTERPRETER: He says 'no.'

THE COURT: Did he try to obtain a loan from the bank?

INTERPRETER: He says he tried to get a loan from the bank.

THE COURT: What was the result of that application?

INTERPRETER: He says everything stopped. Nobody say nothing. She didn't bother him and he didn't bother her.

THE COURT: He didn't go back to the bank and try to obtain a loan?

INTERPRETER: He says 'no.'

THE COURT: He didn't try to make another application?

INTERPRETER: He says 'no.'

THE COURT: Was he working at the time he planned to make this trip?

INTERPRETER: He says at that time he did not work. He work around the house.

THE COURT: Did he earn any income? Did he make any money at that time?

INTERPRETER: He says 'no.'

THE COURT: When did he plan to make the trip?

INTERPRETER: He says he can't go unless he gets enough money to get there.

THE COURT: Why does he want to go back?

INTERPRETER: He says he wants to go see his wife and get his own wife here. He says he never got a divorce from his first wife and she knows he had a wife. He says she corresponded with his wife in Europe.

THE COURT: Did she get him to sign this deed or will as he understood it?

INTERPRETER: He says she told him it was just suppose to be him and her on that. Now he claims the whole family is on the deed. He don't understand it.

THE COURT: He is saying under oath that this wasn't done to secure $1,000.00 for fare to Europe?

INTERPRETER: He says he didn't sign this for $1,000.00.

THE COURT: I have no further questions."

Mr. John Hainen, the attorney who prepared the deed, testified that the appellant first appeared in his office alone; that after considerable difficulty in conversing with him, he concluded that the appellant was desirous of having a deed prepared, but that he did not have the description of the property to be included in the deed. He testified that the appellee then appeared in the office with the deed she and the appellant had obtained when they purchased the property. He testified that the appellant and appellee were obviously hostile towards each other and carried on a rather heated discussion with each other in Polish and occasionally in English he could understand. He says that he heard the amounts of $1,000 and $300 mentioned by the parties, and that two or three different times when $1,000 was mentioned, the appellee would state to the appellant, "I no give you a damn thing. * * * Sell yours cows and get a $1,000.00." He says that the appellee then said to the appellant, "I no give you $300.00. Sell your cows."

Mr. Hainen testified that he had the overall impression from the demeanor of the parties that the appellant was leaving the appellee and was very anxious to get away. He says that in talking to both of them, both before and after the deed was prepared, he was convinced that the appellant wanted to make a deed to the appellee and he testified positively that the appellant knew that a will was not involved. He testified that the appellant seemed very anxious to get the whole matter settled and done with and that when the appellant signed or made his mark on the deed, he knew where to place his mark and it was not necessary to show him where to sign.

The appellant, upon recall, denied that he appeared in the attorney's office before the appellee did, and he testified that it was the appellee who wanted the deed signed. He then concluded as follows:

"Q. Why did you sign it?

A. Interpreter: He says that she told him to go on and sign it over so they'd be fifty-fifty in it. Just like a will, not a deed."

The deed in question is not in the record but it was apparently valid on its face as an absolute conveyance. We cannot say that the chancellor erred in holding the question of consideration immaterial. *O'Connor* v. *Patton,* 171 Ark. 626, 286 S. W. 822. The chancellor went to considerable length in questioning the appellant as to promised monetary consideration as an inducement for signing the deed, and we are unable to say that the chancellor's finding in favor of the validity of the conveyance, under the deed, is against the preponderance of the evidence.

The appellant admitted that the appellee purchased a cow some years ago and that he had nothing to do with that purchase. He testified, however, that all of the cattle belonged to him and the appellee seems to agree with this contention. The chancellor might well have concluded that the parties had attempted to divide their property in contemplation of their separation. The ap-

pellant admits that he has been unable to support his minor daughter and there is no question that he is legally obligated to do so. In any event the chancellor's decree does not appear inequitable.

Having concluded that the chancellor did not err in holding that the deed constituted a valid conveyance from the appellant to the appellee, we are of the opinion that the appellant is in no position to complain as to the trust impressed upon the land in favor of Mary Jean Szklaruk. The title vested in the appellee under the provisions of the deed, and the appellee has not appealed from that part of the chancellor's decree impressing the trust on an undivided one-half interest in the property.

The decree is affirmed.