Rafael CAMARGO *v.* STATE of Arkansas

CR 96-780 940 S.W.2d 464

Supreme Court of Arkansas
Opinion delivered March 17, 1997

[Petition for rehearing denied April 21, 1997.*]

* ARNOLD, C.J., and GLAZE, J., would grant.

*Robert C. Marquette,* for appellant.

*Winston Bryant,* Att'y Gen., by: *Kelly K. Hill,* Deputy Att'y Gen., for appellee.

RAY THORNTON, Justice. Appellant Rafael Camargo was convicted of two counts of capital murder and sentenced to death. On October 31, 1994, he killed his former girlfriend, Deanna Petree, and her fifteen-month-old son, Jonathan. The crimes took place in the home Deanna and Jonathan shared with her mother and three brothers. Her mother and two of the brothers testified that they saw appellant shoot Deanna. Robert, the oldest brother, testified that appellant also pointed the shotgun at him and pulled the trigger; but the gun failed to fire. All the survivors took refuge outside the house and heard additional shots being

fired. They saw appellant flee from the house before the police arrived. When the police arrived, they found Deanna and Jonathan shot to death in the house. Appellant does not challenge sufficiency of the evidence against him, but we have reviewed the record and find substantial evidence to support the convictions of capital murder. Ark. Sup. Ct. R. 4-3(h).

On appellant's motion, he was committed to the state hospital, found competent to stand trial, and found to be sane at the time the crimes were committed, although he was assessed as having limited intellectual capacity. His language skills are in Spanish, and he has little ability to understand or speak English. On appeal, he relies on six points for reversal. We find no error in the guilt phase of the proceedings but find error in the sentencing phase. Therefore, we affirm his convictions for capital murder, but reverse and remand his two sentences of death.

Appellant's assignments of error in the guilt phase include a constitutional challenge to Arkansas's capital murder laws and allegations of error in admitting a videotape and photographs. He argues that the court erred during the sentencing phase in refusing to submit a modified form of jury instructions focusing attention upon the mitigating circumstance of his mental retardation, and that the jury erred in not considering such a mitigating circumstance.

Appellant also contends that the death sentences are invalid because the jury did not complete written findings "[t]hat the aggravating circumstances justify beyond a reasonable doubt a sentence of death" as required by law and the verdict form number three.

### Guilt Phase

Prior to trial, appellant filed a motion to quash the information on the grounds that the Arkansas death penalty laws are unconstitutional. His argument is that Ark. Code Ann. § 5-10-102 (Repl. 1993), is unconstitutional because it fails to adequately narrow the class of persons eligible for the death penalty. He argues that the statute does not enable the State to administer the death penalty "in a way that can rationally distinguish between those individuals

for whom death is appropriate and those for whom it is not." Further, he contends that the definition of "premeditation and deliberation," which this court has held can be formed instantaneously, is unconstitutionally vague. We have discussed these arguments in previous decisions, and we adhere to our prior holdings.

■ On numerous occasions, we have held that there is no constitutional infirmity in the overlapping of the "premeditated and deliberated" *mens rea* in the capital murder statute and the "purposeful" *mens rea* in the first-degree murder statute. *White v. State*, 298 Ark. 55, 764 S.W.2d 613 (1989). *See also, e.g., Nooner v. State*, 322 Ark. 87, 907 S.W.2d 677 (1995); *Greene v. State*, 317 Ark. 360, 878 S.W.2d 384 (1994); *Sanders v. State*, 317 Ark. 328, 878 S.W.2d 391 (1994); *Buchanan v. State*, 315 Ark. 227, 866 S.W.2d 395 (1993); *Mauppin v. State*, 309 Ark. 235, 831 S.W.2d 104 (1992); *Van Pelt v. State*, 306 Ark. 634, 816 S.W.2d 607 (1991); *Smith v. State*, 306 Ark. 483, 815 S.W.2d 922 (1991). The court has explained that it is impossible to avoid the use of general language in the definition of offenses, and that one or the other offense may be established depending on the testimony of witnesses. *White*, 298 Ark. at 59, 764 S.W.2d at 616. While the language in the first-degree murder statute might have been chosen to lighten the possible punishment that might be imposed for conduct falling within the strict definition of capital murder, *id.*, the Supreme Court has held that narrowing of the class of persons eligible for the death penalty does not have to take place at the "definition stage" of the proceedings. *Lowenfield v. Phelps*, 484 U.S. 231 (1988).

■■ The legislature may narrow the definition of capital murder in the statute, or it may more broadly define capital murder and provide for narrowing of the death-eligible class at the penalty phase of the trial. *Id. Lowenfield* was applied in *Johnson v. State*, 308 Ark. 7, 823 S.W.2d 800 (1992), in which this court held that Ark. Code Ann. § 5-4-603(a) (1987 & Repl. 1993) provides the required narrowing by providing that the jury should impose a death sentence only if it unanimously returns written findings that: (1) aggravating circumstances exist beyond a reasonable doubt; (2) aggravating circumstances outweigh beyond a reasonable doubt all mitigating circumstances found to exist; and (3)

aggravating circumstances justify a sentence of death beyond a reasonable doubt. *Johnson*, 308 Ark. at 17, 823 S.W.2d at 800-01. Based upon the statutory narrowing of the death penalty during the sentencing phase, appellant's argument that the statute is unconstitutional has no merit.

We next consider appellant's claim that the admission into evidence of a video tape and photographs of the crime scene, was error. The video tape and photographs are gruesome in their depiction of a crime scene of great violence and brutality. Appellant urges that these exhibits were both cumulative and inflammatory. In connection with our review of this issue, we also consider whether it was error to admit two autopsy photographs into evidence over appellant's objection. Ark. Sup. Ct. R. 4-3(h).

We have often stated that the admission and relevancy of photographs is a matter within the sound discretion of the trial court. *Robinson v. State*, 269 Ark. 90, 598 S.W.2d 421 (1980). Although highly deferential to the trial court's discretion in these matters, this court has rejected a *carte blanche* approach to admission of photographs. *Berry v. State*, 290 Ark 223, 227, 718 S.W.2d 447, 450 (1986). We have cautioned against "promoting a general rule of admissibility that essentially allows automatic acceptance of all photographs of the victim and crime scene the prosecution can offer." *Id.* at 228, 781 S.W.2d at 450. This court rejects the admission of inflammatory pictures where claims of relevance are tenuous and prejudice is great, and expects the trial court to carefully weigh the probative value of photographs against their prejudicial nature. *Id.* at 228-29, 781 S.W.2d at 450. We require the trial court to first consider whether such evidence, although relevant, creates a danger of unfair prejudice, and then to determine whether the danger of unfair prejudice substantially outweighs its probative value. *Beed v. State*, 217 Ark. 526, 609 S.W.2d 898 (1980). Relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. Ark. R. Evid. 403.

Even the most gruesome photographs may be admissible if they tend to shed light on any issue, to corroborate testimony, or if they are essential in proving a necessary element of a

case, are useful to enable a witness to testify more effectively, or enable the jury to better understand testimony. *Weger v. State,* 315 Ark. 555, 869 S.W.2d 688 (1994). Other acceptable purposes are to show the condition of the victim's bodies, the probable type or location of the injuries, and the position in which the bodies were discovered. *Harvey v. State,* 292 Ark. 267, 729 S.W.2d 406 (1987). Of course, if a photograph serves no valid purpose and could only be used to inflame the jury's passions, it should be excluded. *Berry v. State,* 290 Ark 223, 718 S.W.2d 447 (1986). The same guidelines that apply to photographs also apply to videotapes. *Hickson v. State,* 312 Ark. 171, 847 S.W.2d 691 (1993).

■ An essential element of these crimes was the degree of intent; to secure a conviction for capital murder, the State had to prove that appellant caused the victims' deaths "with [a] premeditated and deliberated purpose." Ark. Code Ann. § 5-10-101(1)(4). We have held that the nature and extent of a victim's wounds is relevant to a showing of intent, which may be inferred from the type of weapon used, the manner of use, and the nature, extent, and location of the wounds. *Kemp v. State,* 324 Ark. 178, 919 S.W.2d 943 (1996); *Dansby v. State,* 319 Ark. at 515, 893 S.W.2d at 336. In *Dansby,* we pointed out that upon considering evidence of multiple wounds, the "jury could have easily inferred that appellant fired multiple shots into both victims in a premeditated and deliberated manner." *Id.*

After showing the video to the jury over appellant's objection, the State advised the court that it had two sets of photographs of the crime scene. It had a set of eight to ten photos that it had shown to the defense and planned to introduce. It asked that the second set, consisting of fifteen to twenty photographs, be made an exhibit to the court but not to the jury. The State wanted to show that the photographs had been examined, and that the least inflammatory ones had been chosen for publication to the jury.

The State originally proposed ten photographs for viewing by the jury. There were four photographs of Jonathan, of which appellant asked that the State select Exhibit Four to show one angle and Exhibit Six to show another, and eliminate the other

two. The State agreed to eliminate one. The remaining six photographs were of Deanna's body at the crime scene. Appellant made a continuing objection as the State introduced these as Exhibits Four through Ten, which were all admitted.

The three pictures of Deanna are all of different angles. Exhibit Eight shows Deanna's body from a back angle lying in the hall with a shotgun casing directly under her. Exhibit Nine shows her body from the front angle. Officer Hurst testified that Exhibit Eight showed a different shotgun casing than the one in the previous exhibit. Exhibit Nine shows an angle not visible in Exhibit Eight, and Exhibit Ten depicts a close-up view of the head wound that is not presented by any of the other pictures. During the state medical examiner's testimony, appellant objected to a close-up autopsy picture of Deanna's head and shoulders that depicted her chest wounds and part of her head wound. He also objected to a close-up autopsy shot of Jonathan from the waist up that clearly shows that part of his head is missing. Appellant objected to these as cumulative, and the court overruled, stating that Dr. Sturner, the state medical examiner, had indicated that they would be helpful in explaining the location of the wounds and the stippling.

The videotape, which runs about four minutes, begins in the living room. It shows Jonathan lying on the couch with a massive head wound, and it shows the location of where the blood and the shots went. It continues down the hall, showing Deanna's body lying in a pool of blood and where the blood and shots went around her. There are brief shots of the other rooms in the house. The videotape is somewhat dark and does not show details as clearly as the still shots. However, it provides the viewer a dimensional perspective of the crime scene and the size of the house that the still shots do not give.

The pictures helped the jury to understand the testimony about where and in what condition the body and the shotgun shells were found. *Harvey v. State*, 292 Ark. 267, 729 S.W.2d 406 (1987). They are more clearly visible than the video, which was admissible to aid the jury's perception of the crime scene. Comparing the pictures to the ones that were not used, and which would have been cumulative, we have concluded that the trial

court carefully compared the two sets of pictures, made a well-reasoned determination, and did not abuse its discretion in admitting the pictures with the videotape. *See Weger*, 315 Ark. at 560-61, 869 S.W.2d at 691. Further, evidence of close-range shootings is indicative of premeditation and deliberation.

■ Finally, the trial court did not abuse its discretion in admitting the autopsy pictures. *Hickson v. State*, 312 Ark. 171, 847 S.W.2d 691 (1993). These pictures clearly assisted Dr. Sturner in describing the location of the victims' wounds and the close-range nature of the gunshots; again, matters that were clearly relevant in establishing premeditation and deliberation, among other things.

### Sentencing Phase

Appellant challenges the validity of his death sentences because the jury did not specify in writing "that the aggravating circumstances justify beyond a reasonable doubt a sentence of death." The State contends that review of this challenge is procedurally barred because appellant failed to object when given the opportunity to do so.

■ The State is correct that in numerous cases we have reiterated our fundamental rule that an argument for reversal will not be considered in the absence of an appropriate and timely objection. However, in *Wicks v. State*, 270 Ark. 781, 606 S.W.2d 366 (1980), we recognized the following four extremely narrow and strictly guarded exceptions to the objection requirement: (1) death penalty cases involving an error in a matter essential to the jury's consideration of the death penalty itself; (2) cases where the trial judge made an error of which the appellant had no knowledge; (3) cases where the trial judge neglected his or her duty to intervene; and (4) cases involving evidentiary errors which affected the appellant's substantial rights. *Id.* at 785, 606 S.W.2d at 369.

It is the first exception for death penalty cases involving a matter essential to the jury's consideration of the death penalty that is applicable to the facts at hand. Again, as with the other three exceptions, this is a narrow exception which this court has

rarely applied. In *Wells v. State*, 193 Ark. 1092, 104 S.W.2d 451 (1937), we allowed an exception to the objection requirement where the court failed to require the jury to designate the degree of murder, as required by the statute, so that the jury might have imposed the death penalty for homicide below first-degree murder. Likewise, in *Smith v. State*, 205 Ark. 1075, 172 S.W.2d 248 (1943), we did not require an objection where the court failed to tell the jury that it had the option of imposing a sentence of life instead of the death penalty. Both cases involved an error that was "essential to the jury's imposition of the death penalty itself," and thus we did not require an objection.

Similarly, in *Bowen v. State*, 322 Ark. 483, 911 S.W.2d 555 (1995), we recognized this exception to the "plain error" rule, and we expressly applied the holdings from *Smith* and *Wells*. We held that the consideration during the sentencing phase of a statutorily prescribed aggravating circumstance enacted following the crime required reversal, notwithstanding a failure to bring the issue to the attention of the trial court. *Id.* at 499, 911 S.W.2d at 562.

In this case, the trial court failed to require the jury to render a verdict form that indicated that the jury had made the three findings necessary for imposition of the death penalty as is required by Ark. Code Ann. § 5-4-603 (Repl. 1993). Thus, as in *Wells*, *Smith*, and *Bowen*, the error concerned a matter "essential to the jury's imposition of the death penalty itself," and we therefore do not require an objection to preserve the issue for appellate review.

In reaching this holding, we are not unmindful of our previous declaration in *Goodwin v. State*, 263 Ark. 856, 568 S.W.2d 3 (1978), where we said:

> In cases tried after this date [July 3, 1978], we will not consider an assertion of error in the verdict form, when the issue has not been raised in the trial court in any manner or some adequate reason for doing so is disclosed by the record.

*Goodwin*, however, was not a death penalty case, and thus, the verdict-form error was not regarding a matter essential to the imposition of the death penalty itself. Therefore, the *Wicks* exception was not applicable.

Hence, we have concluded that despite the failure to object, the appellant's assertion of failure to comply with Ark. Code Ann. § 5-4-603 requirements for the unanimous return of written findings by the jury in a death case is an issue properly before this court for review.

 Following the guilt phase of the trial, the sentencing phase of the trial is the means by which the capital murder statute is sufficiently narrowed to meet constitutional challenges for vagueness because of the overlap between degrees of murder. *See Lowenfield v. Phelps*, 484 U.S. 231 (1988). We have upheld the capital murder statute against charges that it does not sufficiently narrow the class of persons that can be executed because the required findings of aggravating and mitigating circumstances during the sentencing phase perform that function. *Willett v. State*, 322 Ark. 613, 911 S.W.2d 937 (1995); *Dansby v. State*, 319 Ark. at 529, 893 S.W.2d at 343; *Cox v. State*, 313 Ark. 184, 853 S.W.2d 266 (1993); *Johnson v. State*, 308 Ark. at 17, 823 S.W.2d at 801-02.

The legislative intent is articulated in the portion of Ark. Code Ann. § 5-4-601 that reads as follows:

> (a) It is the intention of the General Assembly of the State of Arkansas, in enacting this subchapter, to specify the procedures and standards pursuant to which a sentencing body must conform in making a determination as to whether a sentence of death is to be imposed upon a conviction of capital murder.

*Id.* § 5-4-601(a).

The findings required for a death sentence are expressed in Ark. Code Ann. § 5-4-603, which provides as follows:

> (a) The jury shall impose a sentence of death if it unanimously returns written findings that:
>
>> (1) Aggravating circumstances exist beyond a reasonable doubt; and
>>
>> (2) Aggravating circumstances outweigh beyond a reasonable doubt all mitigating circumstances found to exist; and
>>
>> (3) Aggravating circumstances justify a sentence of death beyond a reasonable doubt.

*Id.* § 5-4-603(a). Subsection (b) of § 5-4-603 provides that the jury shall impose a sentence of life imprisonment without parole if it finds that any one of the above findings does not exist. Subsection (c) provides the following:

> (c) If the jury does not make all findings required by subsection (a) of this section, the court shall impose a sentence of life imprisonment without parole.

*Id.* § 5-4-603(c).

In this case, the jury, after finding two aggravating circumstances and one mitigating circumstance, recommended a death sentence for appellant. The aggravating circumstances were his prior felony, which involved physical violence, and the fact that during the commission of these offenses, he put another person in danger. The mitigating circumstance was that he adjusted well to confinement.

The standard "Conclusions" form was used for each victim. The form provides for the jury to indicate as follows:

> (a) ( ) One or more aggravating circumstances *did* exist beyond a reasonable doubt, at the time of the commission of the capital murder.
> (b) ( ) The aggravating circumstances outweigh beyond a reasonable doubt any mitigating circumstances found by the jury to exist.
> (c) ( ) The aggravating circumstances justify beyond a reasonable doubt a sentence of death.

In accordance with statutory requirements for written findings, the instructions on the form direct the jury that if it does not unanimously agree to (a), to skip (b) and (c) and sentence the defendant to life imprisonment without parole. If the jury checks (a), but does not unanimously agree on (b), it is to skip (c) and enter a sentence of life without parole. If the jury checks (a) and (b), but skips (c), it is to enter a sentence of life without parole. Only if the jury checks (a), (b), and (c), may it recommend the death sentence. On the forms for both victims, only (b) is checked. Yet, the jury proceeded to choose the death penalty on the verdict form. When the court read the "Conclusions" form, it noted that the jury had marked (b) only. When asked by the

court if there was any question, both attorneys replied, "No, your honor." The court then polled the jury by asking, "Is this your verdict?" Each juror answered, "Yes." The trial court then entered sentences of death.

In *Hill v. State*, 289 Ark. 387, 713 S.W.2d 233 (1986), we noted that when considering a challenge to the death penalty statute as a "mandatory death sentence," that a "jury cannot impose a sentence of death until it specifically finds that all three parts of the statute apply." *Id.* at 397, 713 S.W.2d at 238.

Before the enactment of the present statutes, we made it clear in a long line of cases that the jury had to comply with the requirements of statutes establishing degrees of murder for which death may be imposed. Soon after the time Arkansas began its existence as a state, on December 17, 1838, an act was passed reading as follows: "The jury shall, in all cases of murder, on conviction of the accused, find by their verdict whether he be guilty of murder in the first or second degree . . . ," and further providing that in the event of a guilty plea, the degree of the crime shall be found by the jury. *Pope's Digest* § 4041.

We have consistently held that the death sentence may not be imposed unless the jury makes the required statutory finding. In the case of *Jones v. State*, 204 Ark. 61, 161 S.W.2d 173 (1942), we stated:

> If it be said that the imposition of the death penalty shows what was intended, it may be answered that a capital sentence may not be imposed by intendment . . . . However technical this may appear, it is nevertheless the requirement of the law.
>
> . . .
>
> We may not ignore the statute . . . by saying that it is technical, or highly technical, nor may we ignore it in a particular case where we feel assured that the jury found the accused guilty of murder in the first degree, but did not reflect that finding in the verdict.

*Id.* at 64, 67, 161 S.W.2d at 174, 175-76.

In the case before us, the State urges that although the jury did not make the written findings required by the statute, the jurors indicated when they were polled that they had unanimously agreed upon the death sentence, and that this made it unnecessary

to follow the statutory structure required by the legislature. We cannot agree with this argument. However technical the requirements of § 5-4-603 may appear, it is nevertheless the requirement of the law.

Similarly, in *Willett v. State*, 322 Ark. 613, 911 S.W.2d 937 (1995), in response to the State's contention that the appellant did not suffer any prejudice due to the fact that the jurors appeared and orally confirmed their death-sentence verdicts in open court, this court refused to apply a harmless-error analysis. While the court stated that it was inclined to conclude that the error was harmless, the United States Supreme Court's rule that all errors relating to mitigating circumstances are prejudicial regardless of the standard prevented it from doing so. *Id.* at 628, 911 S.W.2d at 944-45 (citing *Shipper v. South Carolina*, 476 U.S. 1 (1986)).

We have decided that the failure of the jury to unanimously return a written finding that aggravating circumstances justify a sentence of death beyond a reasonable doubt is an error requiring reversal of the sentencing phase of the case imposing the death penalty, and we remand to the trial court for a new sentencing procedure. Ark. Code Ann. § 5-4-616.

Appellant's remaining arguments regarding the sentencing phase are likely to arise upon retrial for sentencing; therefore, we address these points for guidance to the trial court. Appellant contends that the court erred in refusing to submit a modified instruction form concerning mitigating circumstances during the penalty phase. The proposed modification added mental retardation as a mitigating circumstance. The court refused to allow the instruction, noting that appellant could argue this mitigating circumstance to the jury, and if it so found, the jury could add it as a mitigating circumstance under "Other." As discussed more fully below, appellant did present evidence and argue this factor to the jury.

Appellant relies upon a line of United States Supreme Court cases that hold that any death sentence resulting from a deliberate exclusion of any mitigating circumstance is presumptively invalid. *Penry v. Linaugh*, 492 U.S. 302 (1989); *Hitchcock v. Dugger*, 481 U.S. 393 (1987); *California v. Brown*, 479 U.S. 538

(1987); *Eddings v. Oklahoma*, 455 U.S. 104 (1982); *Roberts v. Louisiana*, 421 U.S. 633 (1977); *Gregg v. Georgia*, 428 U.S. 153 (1976). We find no such deliberate exclusion, because appellant was permitted to make his argument to the jury. We rejected an identical argument in *Sheridan v. State*, 313 Ark. 23, 852 S.W.2d 772 (1993), in which we held that when the defendant is allowed to present the possible mitigators and the jury is told it is not limited to the mitigators listed on the form, it is not error to submit the standard form to the jury in lieu of a form proposed by the defendant. *Id.* at 38, 852 S.W.2d at 779.

As a final point for reversal, appellant urges that the death sentences should be set aside because the jury ignored evidence of mitigating circumstances, the mental retardation of the defendant. Appellant argues that his death sentences should be set aside because the jurors failed to mark the instruction forms appropriately. In Form Two, the jury is required to mark under subsection A that it unanimously found any of the six mitigating circumstances. Under subsection B, the jury was required to mark whether some of the jurors believed any of those six factors existed, and under subsection C, the jury was required to mark whether it unanimously agreed that any of the same factors were not present. The format of this instruction is that the jury is *required* to mark in *each category* whether each factor was unanimously accepted or rejected or whether it was partially accepted. *This was not done.* Appellant argues that the jury erred because it was required to consider his mitigating proof of mental retardation and should have marked the forms appropriately, indicating whether that proof was either unanimously or partially accepted or rejected.

The State contends that this argument is not preserved for review because the verdict forms were read aloud and the court asked if there were any questions, but counsel responded, "No, Your Honor." In short, the State submits that the issue is not preserved for appeal because appellant never lodged an objection to the verdict forms. In *Goodwin v. State*, 263 Ark. 856, 568 S.W.2d 3 (1978), the court held that from the date of that decision onward, an assertion of error in the verdict form will not be considered when the issue has not been raised to the trial court in

some manner. On the merits, the State points out that the proof of mental retardation was not absolute because appellant's report noted that he was not impaired at the time of the offense. The report further opined that appellant was malingering. Thus, according to the State, there is no showing that the jury arbitrarily disregarded anything.

We have already expressed our decision that this case must be reversed and remanded for a new sentencing phase because of the jury's failure to make written findings supporting the imposition of the death penalty. As a result of that decision, it is unnecessary for us to address the question whether appellant is barred from raising the issue concerning incomplete jury forms relating to mitigating factors in this appeal. When the matter is heard in the new sentencing phase, there will be an opportunity for the appellant to timely express any objections to procedure or incomplete forms. We want to express our concern that appellant be provided opportunity to understand the proceedings by means of assistance of persons having competent skills in interpreting language, and that the court make every effort to assure that mitigating circumstances are properly presented to, and considered by, the jury.

In accordance with Ark. Sup. Ct. R. 4-3(h), we have examined the record for all objections decided adversely to appellant, and we find no additional error. We affirm the capital murder conviction, but we reverse the death sentence and remand for new sentencing.

ARNOLD, C.J., and GLAZE, J., concur in part and dissent in part.

NEWBERN, J., concurs.

W.H. "DUB" ARNOLD, Justice, concurring. Because I would affirm both the conviction and sentence in this case, I must respectfully dissent from the portion of the majority opinion that reverses Camargo's case for resentencing.

During the penalty phase, after being instructed by the trial court, the jury first considered, with respect to each victim, Form One, which set forth two possible aggravating circumstances. The two aggravating circumstances listed were that Camargo had pre-

viously committed a felony involving violence, and that, during the commission of the murder, he knowingly created great risk of death to a person other than the victim. The jury unanimously found that both of these aggravating circumstances existed. The jury then proceeded to Form Two, which required them to determine whether mitigating circumstances were shown to exist. The jury unanimously found that the evidence showed the mitigating circumstance that Camargo adjusted well to confinement.

Next, the jury proceeded to Form Three, entitled "Conclusions." This is the form in dispute. The form contains the following three sections:

> (a) ( ) One or more aggravating circumstances did exist beyond a reasonable doubt, at the time of the commission of the capital murder.
> (b) (X) The aggravating circumstances outweigh beyond a reasonable doubt any mitigating circumstances found by the jury to exist.
> (c) ( ) The aggravating circumstances justify beyond a reasonable doubt a sentence of death.

As indicated in the majority opinion, the jury only marked (b) on Form Three. The majority concludes, however, that because the jury failed to mark (a) and (c) a reversal of the death sentence is mandated due to a failure to comply with Ark. Code Ann. § 5-4-603 (Repl. 1993). I strongly disagree.

I do not dispute that, pursuant to § 5-4-603, in order for the death penalty to be imposed, the jury must unanimously return written findings that (1) aggravating circumstances exist beyond a reasonable doubt; (2) aggravating circumstances outweigh beyond a reasonable doubt all mitigating circumstances found to exist; and (3) aggravating justify a sentence of death beyond a reasonable doubt. Where I depart from the majority is that I do not agree that the statute mandates that the jury record all these written findings on Form Three. From my reading of the statute, it only requires that these written findings be made.

In this case, the jury made the first written finding on Form One, when it unanimously found that two aggravating circumstances existed beyond a reasonable doubt at the time of the mur-

der. It is undisputed that, on Form Two, the jury made the second written finding that the aggravating circumstances outweighed beyond a reasonable doubt all mitigating circumstances found to exist. Finally, on Form Four, the verdict form, the jury made the written finding that, after careful deliberation, they determined that Camargo shall be sentenced to:

( ) Life imprisonment without parole.
(X) Death.

The form instructed the jury that, if they returned a verdict of death, each juror was required to sign the verdict. The jury was instructed that they were not to sign this form if they did not unanimously agree that the aggravating cirumstances justified a sentence of death beyond a reasonable doubt. The signature of each of the twelve jurors in the case appears on the form. In my view, by signing this form, the jury made the third required written finding that the aggravating circumstances justified a sentence of death beyond a reasonable doubt.

If there was any doubt regarding whether the jury unanimously decided that Camargo should be put to death for the two murders, it was resolved when the jury was individually polled as to whether this was their verdict, and each answered in the affirmative. Indeed, the most troubling aspect of this case is that when the trial court read Form Three and noted that the jury had marked (b) only, then specifically asked the attorneys if there was any question, both attorneys replied, "No, your honor." The majority employs the *Wicks* exception to conclude that no objection was required. I disagree that this exception applies in this case. In *Wicks v. State*, 270 Ark. 781, 606 S.W.2d 154 (1980), this court discussed this exception as follows:

> In two cases in which the death penalty was imposed, we did not require an objection to the trial court's failure to bring to the jury's attention a matter essential to its consideration of the death penalty itself. In the earlier case the court failed to require the jury to find the degree of the crime, as required by the statute, so that the jury might have imposed the death penalty for a homicide below first-degree murder. *Wells v. State*, 193 Ark. 1092, 104 S.W.2d 451 (1937), In the later case the trial court apparently failed to tell the jury that it had the option of imposing a

life sentence. *Smith v. State*, 205 Ark. 1075, 172 S.W.2d 248 (1943).

270 Ark. at 785-786. In the present case, the failure of the jury to check (a) and (c) on Form Three *was* brought to the attention of the attorneys by the trial court — counsel for Camargo simply waived any objection to the incomplete form. This is not a case where the jury failed to determine the degree of the crime, and this is not a case where the jury was not informed that it had the option of imposing a sentence of life imprisonment without parole. This was a case where each of the twelve jurors signed a verdict form recommending that Camargo be sentenced to death, and where each juror orally confirmed that this was his or her verdict.

The unfortunate practical implication of the majority's decision today is that, when jury forms are left incomplete in the future, a defendant similarly situated is encouraged to stay quiet, wait for a reversal of his death sentence, and hope that, on remand, the State will either offer a life sentence or that another jury may show mercy. Because I cannot ignore this jury's obvious decision to recommend a death sentence for Camargo, I respectfully dissent.

GLAZE, J., joins.

DAVID NEWBERN, Justice, concurring. The majority opinion is correct in every respect, and I join in the opinion. I write separately only to point out my concern about the manner of Spanish-English translation displayed in the record. It is important that the testimony of a witness who does not speak English be taken as closely as possible to the way in which any other witness's testimony would be taken. There should be questions and answers to and from the witness, not to and from the interpreter. The person asking the question should ask it of the witness. The interpreter should do no more than translate the question. In translating the witness's answer, the interpreter should do no more than say what was spoken by the witness but say it in English; in other words, translate the testimony directly.

In this case, the record shows there were instances when the Court or other person asking questions of the witness would say

something like, "Ask him . . . ," the witness would speak, and then the interpreter would say, "He says . . . ." Obviously that turns the interpreter into a witness rather than a translator. An example of this sort of thing appears in *Szklaruk v. Szklaruk,* 251 Ark. 599, 473 S.W.2d 599 (1971). There, as here, no issue was made of the matter, but the objectionable practice of conversing with the interpreter, rather than conversing with the witness through the interpreter, is displayed.

In *Kay v. State,* 260 Ark. 681, 543 S.W.2d 479 (1976), we at least suggested, if we did not make it clear, that the job of an interpreter is simply to repeat the question asked of the witness in the language understood by the witness, and then to repeat the witness's answer in English. The interpreter is not to make "remarks."

Again, no issue has been raised in this case concerning the interpreter and the practice followed. From the record before us, however, I have a concern whether Mr. Camargo's testimony was accurately stimulated by the questions asked of him and accurately recorded through the interpreter.

Another non-issue in this case I regard as one that could have been serious is whether Mr. Camargo knew what other witnesses and court personnel were saying to each other during the trial. An accused's right to presence at the trial is of little value if he or she cannot understand the proceedings.

If a person with limited or nonexistent skills in the English langage is to have a fair trial, or a fair resentencing procedure, great care must be taken in the direct translation process.